# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
May 28, 2015 Session[1]

## IN RE CARRINGTON H. ET AL.

### Appeal by Permission from the Court of Appeals, Middle Section
### Juvenile Court for Maury County
### No. 90576, 90577      George L. Lovell, Judge

_____

### No. M2014-00453-SC-R11-PT – Filed January 29, 2016
_____

We granted review in this case to decide (1) whether an indigent parent's right to appointed counsel in a parental termination proceeding includes the right to challenge an order terminating parental rights based on ineffective assistance of trial and appellate counsel; and (2) whether the Court of Appeals must review any ground the trial court relied on to terminate parental rights when a parent fails to raise all grounds for termination on appeal.  We hold that parents are constitutionally entitled to fundamentally fair procedures in parental termination proceedings.  Nevertheless, this constitutional mandate does not require us to adopt a procedure by which parents may collaterally attack orders terminating parental rights based on ineffective assistance of counsel.  Additionally, we hold that appellate courts must review a trial court's findings regarding all grounds for termination and whether termination is in a child's best interests, even if a parent fails to challenge these findings on appeal.  Having reviewed the record on appeal in accordance with these holdings, we affirm the trial court's judgment terminating the mother's parental rights.

### Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Appeals Affirmed

CORNELIA A. CLARK, delivered the opinion of the Court, in which JEFFREY S. BIVINS and HOLLY KIRBY, JJ., joined.  SHARON G. LEE, C.J., with whom GARY R. WADE, J., joins, concurring and dissenting.

---

[1] We heard oral argument in this case on May 28, 2015, on the campus of Lipscomb University in Nashville, Tennessee, as a part of the American Legion Auxiliary's Volunteer Girls State S.C.A.L.E.S. (**S**upreme **C**ourt **A**dvancing **L**egal **E**ducation for **S**tudents) project.

Rebecca McKelvey Castañeda (discretionary appeal), Nashville, Tennessee, and Mark A. Free (appeal as of right and at trial), Columbia, Tennessee, for the appellant, Vanessa G.

Herbert Slatery III, Attorney General and Reporter; Andrée S. Blumstein, Solicitor General; Mary Byrd Ferrara, Assistant Attorney General; and C. Nicholas Fossett, Assistant General Counsel, for the appellee, Tennessee Department of Children's Services.

## OPINION

### I.      Factual and Procedural Background

This appeal arises from a petition to terminate the parental rights of Vanessa G. ("Mother") to her minor child Carrington. By the time the Tennessee Department of Children's Services ("DCS") filed the petition on October 24, 2013, it had been providing services to Carrington's family for ten years.[2]   Mother's entire history with DCS is not included in the record on appeal, but the record on appeal establishes the following factual background.

Mother gave birth to six children between 1996 and 2004. Carrington, the sixth child, was born November 24, 2004. About seven months before Carrington's birth, Mother and Father were the subjects of a dependency and neglect action in the Juvenile Court for Lewis County.[3]   With the assistance of their attorney, Mother and Father waived their right to an adjudicatory hearing and consented to a finding that their five children were dependent and neglected and that their home was in such a condition as to make it unsafe and unsanitary for the children to reside there. The Juvenile Court awarded temporary custody of the children to DCS but physically placed the children with Mother and Father. The Juvenile Court ordered Mother to continue with mental health treatment and directed both parents to continue with domestic counseling as needed, to cooperate with DCS, and to comply with the permanency plan.

---

[2] DCS's initial petition sought to terminate the parental rights of Carrington's father, Christopher H. ("Father"), as well, and sought to terminate both parents' rights to Carrington's brother, Charles. On the day of trial, December 20, 2013, DCS removed Charles from the petition, because he was within four months of attaining majority, and voluntarily dismissed the petition against Father based on his stated intention to surrender his parental rights to Carrington upon the final termination of Mother's parental rights.

[3] The Juvenile Court for Maury County adjudicated the termination petition. For simplicity, "Juvenile Court" is used to refer to the Juvenile Court for both Lewis and Maury Counties.

On December 2, 2005, when Carrington was nearly thirteen months old, the Juvenile Court ordered all six children removed from their parents' custody through an emergency removal process and placed them in the temporary custody of their maternal grandmother and aunt. After a hearing, the Juvenile Court, on January 10, 2006, ordered the children to continue residing temporarily with their maternal grandmother and aunt but also granted each parent four hours supervised weekly visitation with the children. The adjudicatory hearing was scheduled for February 9, 2006, but the record on appeal does not include the transcript of, or order from, that proceeding.

The record on appeal reflects that a hearing occurred on April 7, 2006, and the Juvenile Court placed the children on a ninety-day trial home visit with Father. Mother, by then divorced from Father, received visitation with the four oldest children every weekend and visitation on alternate weekends with the two youngest children, Brighton, nearly three years old, and Carrington, almost eighteen months old. Mother's visitation was contingent upon a favorable home study by DCS.

On May 5, 2006, for reasons not apparent from the record, the Juvenile Court suspended Mother's visitation with Carrington and Brighton but reinstated her visitation a month later. Nevertheless, the Juvenile Court noted that "there [were] issues concerning [Mother] that concern[ed] the [Juvenile] Court and if not addressed, could lead to severe limitations as to visitation."

About fourteen months later, on July 13, 2007, DCS filed a dependency and neglect petition against Mother in the Juvenile Court for Maury County. DCS sought by the petition to terminate Mother's visitation privileges and to continue custody of the children with Father. DCS filed the petition after receiving a referral alleging sexual abuse and after the four oldest children disclosed during forensic interviews that Mother would "masturbate in front of them." Following a hearing on July 23, 2007, the Juvenile Court, by an August 10, 2007 order, suspended Mother's visitation pending the adjudicatory hearing on DCS's petition, which the Juvenile Court scheduled for August 27, 2007.

The adjudicatory hearing did not actually commence, however, until February 15, 2008, at which time Mother, upon the advice of her appointed counsel and in open court, "waived her right to an adjudicatory hearing." The Juvenile Court entered its orders on March 27, 2008, and upon the requests of counsel for DCS and Father, included findings that the allegations of the petition had been established by clear and convincing evidence and that the children were dependent and neglected because: (1) Mother, by reason of cruelty, mental incapacity, immorality, or depravity was unfit to properly care for them; (2) the children were in such condition of want or suffering or under such improper guardianship or control as to injure or endanger their morals or health; and (3) the children were suffering abuse or neglect. See Tenn. Code Ann. § 37-1-102(b)(12)(B),

- 3 -

(F), (G) (2014).[4]  The Juvenile Court refused to reinstate Mother's visitation with the children and ordered them to remain in the legal and physical custody of Father.  The Juvenile Court deemed its March 27, 2008 order "the final determination as to the claims that the children are dependent and neglected for the reasons set out above" and "advised" the parties that the order could "be appealed for trial *de novo* in the Maury County Circuit Court by filing a notice of appeal within ten (10) days at the office of the Clerk of the Maury County Juvenile Court."  The record on appeal does not indicate that Mother appealed the Juvenile Court's March 27, 2008 order.

On November 17, 2009, the Juvenile Court held a review hearing.  After hearing testimony from DCS and CASA representatives, the Juvenile Court again kept in place its order suspending Mother's visitation with the children.

On December 21, 2009, DCS filed a petition in the Juvenile Court for Maury County, seeking removal of the children from Father's home and alleging that the children were dependent and neglected based upon Father having physically abused five-year-old Carrington by beating and striking him.  By an order entered the same day, the Juvenile Court awarded DCS temporary custody of the children.

About three months later, on February 18, 2010, the Juvenile Court ruled that Mother would "have no visitation or contact with the children until the children, on their own volition, request[ed] such visitation, and then only with the guidance and facilitation of the children's treating professionals."  Regarding Father, the Juvenile Court ruled that if he failed to comply with the requirements set forth for him, either DCS or the children's guardian ad litem "should file the appropriate motions or petitions with the Juvenile Court to assure the children have permanency in this matter."

Eight days later, on February 26, 2010, DCS provided Mother with a document titled "Criteria and Procedures for Termination of Parental Rights" and reviewed the contents of the document with Mother.  Mother signed the document, acknowledging that she had received it along with an explanation of its contents.

On September 20 and 28, 2011, Mother and her appointed counsel participated in the development of family permanency plans.  As relevant to Carrington, these permanency plans described the concerns regarding Mother as: (1) "a history of mental health instability and abuse of prescription medication"; (2) "sexually inappropriate [conduct] with her children"; and (3) "a history of environmental neglect and unsafe

---

[4] Unless the language of the statute has changed since the filing of the petition to terminate Mother's parental rights, citations in this opinion shall refer to the current version of the statute.

housing." The enumerated goals and actions for Mother were: (1) taking her medications as prescribed by her treating professional; (2) providing documentation to DCS of her prescriptions and providers and the pharmacy used for her prescriptions; (3) submitting to random drug screens; (4) asking her mental health provider to furnish an assessment of her emotional ability to parent her children; and (5) providing DCS with a plan for the children in the event she experienced a seizure or a blackout, such as she had previously reported experiencing.

As to the three oldest children only, the permanency plans required Mother to: (1) overcome her denial of sex abuse and acknowledge it verbally or in writing to a professional counselor; (2) cooperate with her treating professional and the children's treating professionals to ensure appropriate boundaries were implemented and understood and to address the possibility of parental alienation; (3) ensure that no inappropriate sexual materials, books, magazines, pictures, or videos were around the children; (4) provide clean and clutter-free housing with enough space and furniture for the children; (5) provide DCS with six consecutive months of paid rental and utility receipts as proof of stability; and (6) provide proof of legal income sufficient for her family's needs. Mother was expected to satisfy these goals by January 2012.

On October 14, 2011, the Juvenile Court entered a final order on DCS's December 21, 2009 dependency and neglect petition against Father. The Juvenile Court found that Father had abused Carrington in December 2009, and that Carrington had suffered a swollen and bruised nose and bruises on his stomach, sides, legs, ankles, and arm.[5] The Juvenile Court found by clear and convincing evidence that, as to Carrington, Father's actions constituted abuse, but not severe abuse, under the relevant statutes. As to the other children, the Juvenile Court found that Father's actions threatened their health by subjecting them to inappropriate discipline and threatened their morals because Father had lied about his own actions and had coached the children to lie to the authorities about his actions. See Tenn. Code Ann. § 37-1-102(b)(12)(B), (F), and (G). Based on these findings, the Juvenile Court concluded that the children were dependent and neglected and ordered them to remain in DCS custody.

In so ruling, the Juvenile Court reviewed the history of the case. The Juvenile Court emphasized that the children had already been adjudicated dependent and neglected as to Mother because she "would discipline the children by dressing in a

---

[5] Father was charged with aggravated child abuse for inflicting these injuries but eventually pleaded guilty to child abuse, for which he received a three-year sentence, suspended upon service of three years' supervised probation.

negligee and masturbating in front of them, then putting her fingers under their nose[s] or into their mouth[s]." The Juvenile Court noted that the children "[had] been in numerous foster home placements" and had been "to innumerable interviews by DCS in two counties for several incidents, by police involving the abuse by Father, and by mental health assessors, counselors, and therapists." The Juvenile Court described the children as having "been through the wringer" and stated that the matter had begun "as a situation . . . with a Mother who had serious mental problems, beside[s] trying to raise six children, and a Father who was not as engaged as he should have been in the day-to-day care of the children." The Juvenile Court found that DCS had made "not only reasonable efforts, but Herculean efforts," to rectify the situation and had provided or offered services to the children and parents for many years.

At a permanency hearing a month later, on November 7, 2011, Mother's appointed counsel orally moved the Juvenile Court to grant Mother visitation with the children. The Juvenile Court scheduled a hearing on the motion for December 19, 2011. The record on appeal does not include, however, any further orders or information regarding the disposition of Mother's motion, any hearing on the motion, or any other court proceeding in the dependency and neglect actions against Mother and Father.

By the time DCS filed the October 24, 2013 petition to terminate parental rights from which this appeal arises, Mother had been without the physical custody of the children since December 2005, almost eight years, and without visitation privileges since July 2007, although the Juvenile Court had approved her having supervised visitation if any of the children requested it. In its petition, DCS alleged that the following three grounds supported termination of Mother's parental rights: (1) substantial noncompliance with the permanency plan;[6] (2) the persistence of the conditions that led to the removal of Carrington;[7] and (3) mental incompetence.[8]

---

[6] Tennessee Code Annotated section 36-1-113(g)(2) (2015 Supp.) provides that "substantial noncompliance by the parent . . . with the statement of responsibilities in a permanency plan" is a ground for termination of parental rights. Another statute provides:

Substantial noncompliance by the parent with the statement of responsibilities provides grounds for the termination of parental rights, notwithstanding other statutory provisions for termination of parental rights, and notwithstanding the failure of the parent to sign or to agree to such statement if the court finds the parent was informed of its contents, and that the requirements of the statement are reasonable and are related to remedying the conditions that necessitate foster care placement. The permanency plan shall not require the parent to obtain employment if such parent has sufficient resources from other means to care for the child, and shall not require the parent to provide the child with the child's own bedroom unless specific safety or medical reasons exist that would make bedroom placement of the child with another child unsafe.

(continued…)

On December 20, 2013, the Juvenile Court for Maury County held a hearing on the petition. Four attorneys were present at the hearing, including Mother's appointed counsel, Father's appointed counsel, Carrington's guardian ad litem, and the attorney for DCS. Of the four attorneys, only Mother's appointed counsel presented opening statements. Mother's appointed attorney asked the Juvenile Court not to rely upon the 2005 order depriving Mother of custody of her children as a basis for establishing persistence of conditions. He argued that Mother's failure to pay child support for

(…continued)

Tenn. Code Ann. § 37-2-403(a)(2)(C) (2014).

[7] Persistence of the conditions that led to the child's removal from a parent's home is grounds for termination where:

(3) The child has been removed from the home of the parent or guardian by order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent or parents or the guardian or guardians, still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or parents or the guardian or guardians in the near future; and

(C) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home[.]

Tenn. Code Ann. § 36-1-113(g)(3).

[8] Termination of parental rights is permissible if clear and convincing evidence establishes that:

(i) The parent or guardian of the child is incompetent to adequately provide for the further care and supervision of the child because the parent's or guardian's mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent or guardian will be able to assume or resume the care of and responsibility for the child in the near future; and
(ii) That termination of parental or guardian rights is in the best interest[s] of the child[.]

Tenn. Code Ann. § 36-1-113(g)(8)(B).

Carrington and to visit Carrington were the results of her having income only from disability benefits and of court orders that prevented her from visiting with the children.

DCS presented the testimony of four witnesses and introduced a number of exhibits, including the September 20 and 28, 2011 permanency plans. Although Mother presented no other evidence, her appointed counsel cross-examined each DCS witness.

Tabitha Smith, a counselor service worker for the Department of Human Services, testified as to Mother's compliance with the permanency plans. Ms. Smith first became involved with the case in 2009, after the children were removed from Father's home. According to Ms. Smith, Mother had attempted to comply with many of the requirements of the permanency plans but had not complied fully. In particular, Ms. Smith testified that Mother had failed to: (1) submit to and pass random drug testing; (2) provide an opinion from a mental health professional that she is emotionally capable of parenting her children; (3) provide proof of six consecutive months of paid rent and utilities; (4) provide DCS with proof that she receives legal income sufficient to support her family; (5) provide DCS with a safety plan for what would happen with the children should she have a seizure; (6) provide sufficient space and beds in her home for the minor children; and (7) acknowledge to a counselor that the children had been sexually and physically abused. Ms. Smith agreed that Mother had attended 95% of her scheduled meetings, but she stated that Mother had behaved erratically at the meetings. On one such occasion, Ms. Smith had driven Mother to a local hospital after the meeting because Mother's speech was slurred and her behavior erratic.

In response to cross-examination questions from Mother's appointed attorney, Ms. Smith acknowledged that she had asked Mother to submit to random drug testing on only three occasions and had not asked Mother to submit a urine sample for drug testing since 2011—two years before the hearing. Ms. Smith agreed that Mother had been receiving Social Security disability benefits since 2008, and she conceded that Mother could have advised DCS of the amount of her disability income before Ms. Smith became involved in the case. To Ms. Smith's knowledge, Mother had no outstanding debts to suggest that Mother's disability income would be insufficient to enable Mother to provide for her family's basic needs. When asked about her testimony that Mother's home lacked adequate space and bedding for the children, Ms. Smith acknowledged that she had not been inside Mother's home since the spring of 2012, more than a year before the hearing. When asked about her testimony that Mother had failed to provide the opinion of a mental health expert regarding her emotional capacity to parent the children, Ms. Smith agreed that Mother had provided DCS with a medical release and authorization to contact her service providers directly to obtain Mother's records. Ms. Smith conceded that DCS had provided Mother's mental health counseling services and could have contacted Mother's service providers directly. Indeed, Ms. Smith confirmed that DCS actually had asked one of Mother's providers to furnish an opinion on her emotional parenting

capability. With regard to the requirement that Mother acknowledge sexual abuse, Ms. Smith agreed that Mother's psychosexual evaluation, conducted on March 5, 2009, "indicated that [Mother] produced a valid test result which demonstrated no sexual pathology even upon recent resubmission of the test."

Elysse Beasley, a psychotherapist and licensed senior psychological examiner and professional counselor, testified for DCS as an expert in the fields of psychology and psychological examination. Ms. Beasley, who had conducted Mother's March 5, 2009 psychosexual evaluation and Mother's July 2, 2013 psychological evaluation, authenticated and submitted copies of her evaluation reports.

According to Ms. Beasley, the purpose of the July 2, 2013 evaluation was to determine whether Mother's psychological condition would permit her to care for her children safely. Ms. Beasley's evaluation of Mother consisted of a clinical interview, a clinical mental status examination, review of reports of Mother's earlier evaluations, review of documents DCS provided, and the administration of numerous psychological tests, including the Minnesota Multiphasic Personality Inventory-2, Millon Clinical Multi-Axial Inventory-III, Adult Adolescent Parenting Inventory-2, and Substance Abuse Subtle Screening Inventory-3.

From the clinical interview and review of Mother's medical records, Ms. Beasley learned that Mother had been hospitalized in November 2006 for eight days for treatment of depression and anxiety. In 2009, Mother received inpatient treatment at Rolling Hills Psychiatric Hospital and Cumberland Heights. In 2011, Mother was hospitalized for six days at Vanderbilt University Medical Center, after a friend reported that Mother had been carrying around razor blades and threatening to harm herself. During the 2011 hospitalization, Mother was diagnosed with Bipolar II Disorder, Post Traumatic Stress Disorder, Sedative, Hypnotic, or Anxiolytic Dependence, and Opioid Abuse, with underlying Borderline Personality Disorder. In September 2012, Mother was again hospitalized at Rolling Hills Psychiatric Hospital for seventeen days and was treated for polysubstance dependence, depression, suicidal ideation, and Xanax abuse.

Ms. Beasley concluded, based on the clinical interview and Mother's test results, that Mother has poor insight, poor impulse control, and widely shifting mood swings. Ms. Beasley opined that Mother suffers from post-traumatic stress disorder, caused by an abusive relationship and the anxiety and nightmares associated with reliving the trauma. Ms. Beasley also noted Mother's well-documented history of drug abuse and her Axis II diagnosis of histrionic personality disorder. Histrionic personality disorder, Ms. Beasley explained, is characterized by intense unstable relationships, dramatic behavior, and a need to be noticed, which results in exaggeration, attention seeking, rapidly shifting emotions, gullibility, rash decision-making, and suicide attempts. Ms. Beasley explained that, like all personality disorders, histrionic personality disorder is a longstanding and

very entrenched personality characteristic "that tends to be very, very, very difficult to treat." Mother's histrionic personality disorder, Ms. Beasley opined, has become a "very ingrained part of who she is and how she operates, and there are no medications for treating personality disorders, although medications might help with bouts of depression."

Ms. Beasley explained that Mother's Global Assessment of Functioning results indicated that Mother's mental health moderately interferes with her ability to function on a day-to-day basis and that she has suicidal ideations. Ms. Beasley noted as well that Mother's Substance Abuse Subtle Screening Inventory produced unreliable results. Although Mother denied alcohol or drug usage in the six months prior to the screening, Mother's high defensiveness and high supplemental-addiction-measure scores indicated that she was trying to minimize evidence of personal problems and that she had given answers similar to those given by defensive persons with substance abuse disorders.

Ms. Beasley opined within a reasonable degree of professional certainty that Mother is neither competent nor able to provide for or fully care for Carrington due to her mental condition. Although Mother had been in treatment to address her substance abuse problems, Ms. Beasley concluded that very little had changed in Mother's emotions, depression, anger, or method of handling these issues since Ms. Beasley evaluated Mother in 2009. Ms. Beasley pointed out that, even without the stress of caring for the children, Mother had been hospitalized multiple times between 2006 and 2012 and was still experiencing stress-related difficulties in 2013. Ms. Beasley emphasized that the hospitalizations were merely the culmination of Mother's problems, and she opined that Mother would have had "all kinds of symptoms and inabilities to function prior to the hospitalization[s]." Ms. Beasley testified that all of Mother's symptoms were present both in 2009 and at the time of the July 2013 evaluation and were unlikely to resolve in the near future. Ms. Beasley explained:

> [Mother] has little psychological insight. She is defensive and reluctant to engage in self-exploration. Additionally, she has little motivation to change her behavior since she blames others for the situation in which she finds herself. Long-term commitment to therapy is required before [Mother's] personality would substantially change. However, individuals with her profile often terminate treatment early. At this point in time, [Mother] does not have the physical and emotional well-being to safely care for her six children and past therapy efforts from 2005 to the current time have proven unsuccessful in providing long term improvement in her psychological functioning.

According to Ms. Beasley, the more stress Mother is under, "the more reduced her ability to function becomes." After Ms. Beasley explained that her opinions were aimed

at answering the question of whether Mother has the emotional capacity to parent a normal child, counsel for DCS asked whether Mother has the emotional capacity to parent a child with "a behavioral problem or disorder that result[s] in periodic outbursts of anger, demonstrated by kicking and screaming, refusing to listen to or take instruction, sort of an oppositional defiance to being told what to do, when to do it, and how to do it." To this question, Ms. Beasley responded, "[T]hat sort of child would be difficult to manage even for somebody, you know, who was not suffering from any of this." Although Ms. Beasley did not view Mother as posing a risk of physical abuse to the child, she opined that Mother would pose a risk of emotional abuse to the child.

Mother's appointed counsel cross-examined Ms. Beasley, focusing on the conclusion in Ms. Beasley's 2009 psychosexual evaluation report that Mother had produced a valid test and that, while it could not be stated that Mother was not culpable of a sexual offense, there was no sexual pathology to support an inference of culpability. Mother's appointed counsel also questioned Ms. Beasley regarding the telephone call she had received from a DCS employee after submitting her 2009 evaluation report to DCS. According to Ms. Beasley, the DCS employee stated that her boss was not happy with the report and asked Ms. Beasley whether DCS could send her additional information about the case to review, in the event it might change the results of her evaluation report. Ms. Beasley testified that she informed the DCS employee that additional information would not change the facts or the results of the evaluation. Nevertheless, Ms. Beasley decided to resubmit the raw test data, but the results of the evaluation did not change. Ms. Beasley agreed that, after the 2009 evaluation, she had recommended family therapy with Mother, "with the goal of working towards supervised visitation." Mother's appointed counsel then asked Ms. Beasley her opinion of the Juvenile Court's 2009 decision to deny Mother visitation with the children, unless the children requested visitation with Mother. Ms. Beasley responded that, at the time of the decision, the children ranged in age from five to twelve years old, and that, in her opinion, "[i]t should not have been left up to the children . . . whether or not they should see a parent or not see a parent." In response to further cross-examination questioning, Ms. Beasley opined that some attempt should have been made "towards visitation and some sort of reconciliation with [Mother]."

Leslie Ross also testified for DCS. Ms. Ross was an outpatient therapist at Centerstone, one of Mother's mental health service providers. Ms. Ross treated Mother in 2012 for depression, post-traumatic stress disorder, issues concerning visitation with her children, and medication. During this time, Ms. Ross ordinarily counseled with Mother once per week, but not less than once per month. In January 2013, Centerstone asked Mother to sign a behavior contract due to ongoing problems. The contract required Mother, among other things, to see a particular staff member who would prescribe clinically appropriate medications but who would not prescribe Ativan as Mother requested. The contract also required Mother to refrain from: (1) sending emails to

Centerstone staff; (2) calling Centerstone several times each day demanding to speak to staff members; (3) using inappropriate language and/or threatening language with her case manager; and (4) using verbally aggressive or inappropriate language, including yelling, name calling, and cursing, toward Centerstone staff and other patients. When Mother refused to sign the agreement, Centerstone refused to continue providing Mother with services.

On cross-examination, Mother's appointed counsel elicited testimony from Ms. Ross that, prior to the problems that culminated in Centerstone presenting Mother with the behavior contract in 2013, Mother had received treatment at Centerstone for more than ten years without incident.

Richard Walker, a clinical social worker at Centerstone, also testified for DCS as an expert witness in social work and child therapy. Mr. Walker explained that Carrington had been diagnosed with reactive attachment disorder and oppositional defiant disorder.[9] According to Mr. Walker, reactive attachment disorder usually arises in young children when their patterns of attachment are disrupted, causing them to have problems forming and sustaining attachments. Mr. Walker stated that Carrington's behavioral problems are atypical. For the most part, Carrington functions as a normal child but becomes unmanageable when he is upset. During these periods, Carrington refuses to cooperate with anyone, and unless he is physically restrained, Carrington kicks, screams, bites, throws things, and attacks other children and anyone else who tries to direct him. According to Mr. Walker, these episodes of Carrington losing control coincide with impending moves. As an example, Dr. Walker explained that in 2011, when Carrington was moved from one home to another home, his foster parents had difficulty controlling his behavior. Carrington would alternate between clinging to his foster parents and becoming oppositional and combative. At the time of the hearing, Mr. Walker was treating Carrington with talk and play therapy, counseling him on cooperating with others, and teaching him skills for building friendships and getting along with other people. Mr. Walker opined that a permanent and stable living arrangement in a nurturing home, where the attachments do not break, even when Carrington becomes upset, is critical to Carrington's well being. Placing Carrington with a parent with histrionic personality disorder would be almost the exact opposite of the home environment that he needs, according to Mr. Walker, because a parent with histrionic personality disorder would be unable to provide the stable home environment Carrington needs. Mr. Walker explained that, although visitation with a parent with histrionic personality disorder would be disruptive for Carrington, the disruption would be more limited because

_____

[9] Carrington had also been diagnosed with attention deficit disorder, but Mr. Walker disagreed with this diagnosis.

exposure to the parent's unstable behavior patterns and emotions would be periodic rather than constant.

On cross-examination by Mother's appointed attorney, Mr. Walker agreed that he had been aware of the 2009 order giving the children the choice of whether to visit with Mother. When asked his opinion of this arrangement, Mr. Walker stated that he would have favored an approach "where the children were not the ones who made th[e] decision" and "[which] involved periodic visits with [Mother] and, in this case, under close supervision."

Mother did not present any additional proof. In closing argument, Mother's appointed counsel contended that DCS had failed to carry its burden of establishing any of the alleged grounds for termination by clear and convincing evidence. He also argued that Mother was not at fault for the 2009 order allowing the children to make the decision on whether to visit with her, and that, because Mother had not been allowed to visit with Carrington, the proof regarding her inability to parent was purely speculative. He asserted that DCS had put aside Mother's case while it pursued the abuse charges against Father and had failed to make any effort to reunify Mother with Carrington.

In his closing argument, Carrington's guardian ad litem described the case as "probably the saddest" with which any of the lawyers involved had ever dealt. Nevertheless, he asked the Juvenile Court to terminate Mother's parental rights, explaining that "with the histrionic personality disorder and all the other sad issues that [Mother] has had to deal with in her life," Mother lacks the capacity to parent a difficult child, like Carrington, and her mental status would be detrimental to him.

At the conclusion of the December 20, 2013 hearing, the Juvenile Court took the matter under advisement and issued its final order on February 27, 2014, terminating Mother's parental rights to Carrington.[10] The Juvenile Court found by clear and convincing evidence that (1) Mother had failed to substantially comply with the requirements of the permanency plan; (2) Carrington had been removed from Mother's home by court order for more than six months, and the conditions that led to Carrington's removal still persisted, and there was little likelihood that these conditions would be remedied at an early date so that Carrington could safely return to Mother in the near future, and the continuation of the parent-child relationship greatly diminished Carrington's chances of early integration into a safe, stable, and permanent home; (3)

---

[10] On January 30, 2014, DCS filed a motion to ascertain the status of the Juvenile Court's decision. See Tenn. Code Ann. § 36-1-113(k) (requiring trial courts to render decisions within thirty days of the conclusion of a hearing on a petition to terminate parental rights).

Mother was incompetent to adequately provide for the further care and supervision of Carrington and it was unlikely that Mother would be able to assume or resume the care of and responsibility for Carrington in the near future; and (4) termination of Mother's parental rights was in Carrington's best interest.

Mother appealed from the trial court's judgment terminating her parental rights.[11] On appeal, Mother's appointed attorney argued that the Juvenile Court erred in finding clear and convincing evidence to establish the termination grounds of substantial noncompliance and persistence of conditions. Appointed counsel also argued that the trial court erred by finding clear and convincing evidence that termination of Mother's parental rights was in Carrington's best interests. Appointed counsel did not appeal the trial court's finding that Mother lacked the mental competency to provide for Carrington's care and supervision.

On October 21, 2014, the Court of Appeals affirmed the trial court's judgment but declined to review any of Mother's challenges to the trial court's grounds for termination. In re Carrington H., No. M2014-00453-COA-R3-PT, 2014 WL 5390572, at *5 (Tenn. Ct. App. Oct. 21, 2014). The intermediate appellate court reasoned that, because Mother had not appealed the trial court's finding she lacked the mental competency to parent Carrington, the trial court's finding on that ground was final and furnished a sufficient basis for the appellate court to affirm the trial court's decision terminating Mother's parental rights. The Court of Appeals affirmed the trial court's finding that DCS offered clear and convincing evidence to establish that termination of Mother's parental rights was in Carrington's best interests. Id. at *8. On November 5, 2014, the Court of Appeals granted appointed counsel's motion to withdraw as counsel for Mother.

Thereafter, Mother, proceeding pro se, timely filed an application for permission to appeal in this Court. She asserted that her appointed counsel's representation was inadequate and deprived her of the right to counsel statutorily guaranteed to indigent parents in termination proceedings. Specifically, Mother asserted that she had been prejudiced by appointed counsel's deficient representation during the 2008 dependency and neglect proceeding and during the parental termination trial and appeal. Mother also

---

[11] On the same day that DCS filed the motion to ascertain status, January 30, 2014, Mother's attorney filed a motion requesting to be relieved as appointed counsel for Mother. Appointed counsel alleged that he had represented Mother since 2007 and proposed "that a 'fresh perspective' would best serve Mother's interests in the event that an appeal, as of right, is taken from the ruling of this court." The record does not reflect that the Juvenile Court ruled on the motion. Having not been relieved, appointed counsel filed a notice of appeal on Mother's behalf and represented her before the Court of Appeals.

- 14 -

asserted that the Court of Appeals erred by declining to review the sufficiency of the evidence to support the Juvenile Court's findings regarding the grounds for termination.

We granted Mother's pro se application for permission to appeal and appointed new counsel to represent her before this Court. In re Carrington H., No. M2014-00453-SC-R11-PT (Tenn. Jan. 28, 2015) (order granting pro se application, appointing counsel, and setting out issues of particular interest).[12] We also directed the parties to address the following issues:

> (1)     Whether the right to counsel in a termination of parental rights proceeding includes the right to the effective assistance of counsel; and

> (2)     If so, what procedure and standard should the Court adopt to review that claim?

## II. Analysis

### A.  Standards Governing Parental Termination Trial Proceedings

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.[13]  Troxel v. Granville, 530 U.S. 57, 65 (2000); Stanley v. Illinois, 405 U.S. 645, 651 (1972); In re Angela E., 303 S.W.3d 240, 250 (Tenn. 2010); In re Adoption of Female Child, 896 S.W.2d 546, 547-48 (Tenn. 1995); Hawk v. Hawk, 855 S.W.2d 573, 578-79 (Tenn. 1993).  But parental rights, although fundamental and constitutionally protected, are not absolute.  In re Angela E., 303 S.W.3d at 250.  "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." Hawk, 855 S.W.2d at 580 (quoting In re Hamilton, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); see also Santosky v. Kramer, 455 U.S. 745, 747 (1982); In re Angela E., 303 S.W.3d at 250.

---

[12] The Court is grateful to attorney Rebecca McKelvey Castañeda of the law firm of Stites & Harbison, PLLC, for providing Mother with outstanding representation in this appeal.

[13] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . .").  Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

"When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." Santosky, 455 U.S. at 759. "Few consequences of judicial action are so grave as the severance of natural family ties." Id. at 787; see also M.L.B. v. S.L.J., 519 U.S. 102, 119 (1996). The parental rights at stake are "far more precious than any property right." Santosky, 455 U.S. at 758-59. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of "severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(l)(1); see also Santosky, 455 U.S. at 759 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. Santosky, 455 U.S. at 754; see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C., 452 U.S. 18, 27 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof—clear and convincing evidence. Santosky, 455 U.S. at 769. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. Id.; In re Bernard T., 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." In re Bernard T., 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. In re Audrey S., 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); In re M.A.R., 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1-113(c) provides:

Termination of parental or guardianship rights must be based upon:

(1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and

(2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[14] for termination exists and that termination is in the child's best interests.  In re Angela E., 303 S.W.3d at 250; In re F.R.R., III, 193 S.W.3d 528, 530 (Tenn. 2006); In re Valentine, 79 S.W.3d 539, 546 (Tenn. 2002).  "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination."  In re Angela E., 303 S.W.3d at 254.  Although several factors relevant to the best interests analysis are statutorily enumerated,[15] the list is illustrative, not exclusive.  The parties are free to offer proof of other relevant factors.  In re Audrey S., 182 S.W.3d at 878.  The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest."  In re Kaliyah S., 455 S.W.3d 533, 555 (Tenn. 2015).  These requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away."  In re Swanson, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions.  A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child."  Tenn. Code Ann. § 36-1-113(k).  A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing."  Id.  This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights."  In re Angela E., 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests."  Id.  If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the grounds for termination, the trial court must also include these findings in the written order."  Id.  Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings."  Id. (citing Adoption Place, Inc. v. Doe, 273 S.W.3d 142, 151 & n. 15 (Tenn. Ct. App. 2007)).

---

[14] Tenn. Code Ann. § 36-1-113(g)(1)-(13).

[15] Tenn. Code Ann. § 36-1-113(i).

### B. Standards of Appellate Review

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). In re Bernard T., 319 S.W.3d at 596; In re Angela E., 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. In re Bernard T., 319 S.W.3d at 596; In re M.L.P., 281 S.W.3d 387, 393 (Tenn. 2009); In re Adoption of A.M.H., 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights. In re Bernard T., 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. In re M.L.P., 281 S.W.3d at 393 (quoting In re Adoption of A.M.H., 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. In re Angela E., 303 S.W.3d at 246.

### C. Scope of Appellate Review

The Court of Appeals declined to consider Mother's challenges to two of the three grounds on which the trial court based its decision to terminate her parental rights. In re Carrington H., 2014 WL 5390572, at *5. The Court of Appeals reasoned that because Mother failed to challenge the third ground for termination, mental incompetency, the trial court's finding on that ground became final and is sufficient to support the trial court's decision terminating Mother's parental rights. Id. DCS agrees with the Court of Appeals' reasoning and asks us to affirm its ruling on this issue.

The Court of Appeals has disagreed on the scope of review in parental termination appeals. Some panels have declined to address any of the grounds for termination where a parent appeals fewer than all of the grounds relied on by the trial court for termination or only appeals the trial court's decision as to the child's best interests. See In re Patrick J., No. M2014-00728-COA-R3-PT, 2014 WL 7366946, at *1 (Tenn. Ct. App. Dec. 23, 2014); In re Alexis L., No. M2013-01814-COA-R3-PT, 2014 WL 1778261, at *1 (Tenn. Ct. App. Apr. 30, 2014); In re Kyla P., No. M2013-02205-COA-R3-PT, 2014 WL 4217412, at *3 (Tenn. Ct. App. Aug. 26, 2014); In re A.T.S., No. M2004-01904-COA-R3-PT, 2005 WL 229905, at *3 (Tenn. Ct. App. Jan. 28, 2005). At least one panel has held that when a parent appeals only the trial court's decision on the child's best interests, the Court of Appeals has a duty to examine the record to determine whether the evidence is sufficient to prove by clear and convincing evidence at least one of the grounds for

termination.  <u>In re Jason C.H.</u>, No. M2010-02129-COA-R3-PT, 2011 WL 917389, at *4 (Tenn. Ct. App. Mar. 16, 2011).  At least one other panel has held that all grounds relied on by the trial court to terminate parental rights should be reviewed, even though all of the grounds were not raised on appeal.  <u>In re Robert D.</u>, No. E2013-00740-COA-R3-PT, 2014 WL 201621, at *11 (Tenn. Ct. App. Jan. 17, 2014).  Other panels have exercised the discretion Tennessee Rule of Appellate Procedure 13 provides to review the trial court's determination of the child's best interests even though the parent did not raise that issue on appeal, citing the gravity of the consequences of terminating parental rights.  <u>In re Brittany D.</u>, No. M2015-00179-COA-R3-PT, 2015 WL 5276169, at *7 (Tenn. Ct. App. Sept. 9, 2015); <u>In re Justin K.</u>, No. M2012-01779-COA-R3-PT, 2013 WL 1282009, at *8 n.6 (Tenn. Ct. App. Mar. 27, 2013).

Although this issue has not previously been squarely presented to this Court, we commented upon it in <u>In re Angela E.</u>  There, after holding that trial courts are obligated to make factual findings on each ground alleged for termination, we stated:

> Consistent with the same policies—that is, the importance of permanently placing children and the just, speedy resolution of cases—the Court of Appeals should likewise review the trial court's findings of fact and conclusions of law as to each ground for termination, even though the statute only requires the finding of one ground to justify terminating parental rights.  The Court of Appeals' thorough review of all grounds decided by the trial court will prevent unnecessary remands of cases that we hear in this Court.

303 S.W.3d at 251 n.14 (citations omitted).  DCS argues that the foregoing language does not require the Court of Appeals to review every ground for termination of parental rights, regardless of whether the issue has been raised on appeal, because issues not raised on appeal cannot be raised in this Court.  DCS also maintains that imposing such a requirement would have the effect of encouraging "counsel to raise frivolous issues on appeal in termination proceedings" and "would operate against the child's interest in prompt resolution of the termination proceeding."

We certainly have no desire to encourage attorneys to raise frivolous issues in any appeal.  Nor do we wish to prolong the resolution of parental termination proceedings.  But we fail to see how requiring the Court of Appeals to review thoroughly the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests would produce either of these undesirable results.  To the contrary, requiring this review will ensure that fundamental parental rights are not terminated except upon sufficient proof, proper findings, and fundamentally fair procedures.  Requiring this review should not prolong any appeal already pending before the Court of Appeals by any measurable degree and has the potential to reduce the number of

applications for permission to appeal filed in this Court. This will, in turn, advance the important goal of concluding parental termination litigation as rapidly as possible "consistent with fairness." Lassiter, 452 U.S. at 32; In re D.L.B., 118 S.W.3d 360, 367 (Tenn. 2003) (discussing the rationale for requiring trial courts to make findings on each ground and recognizing the importance of establishing permanent placements for children).

Although DCS is correct that issues not raised in the Court of Appeals generally will not be considered by this Court, there are exceptions to this general rule. Indeed, we recognized recently that "Rules 13(b) and 36(a) of the Tennessee Rules of Appellate Procedure, considered together, give appellate courts considerable discretion to consider issues that have not been properly presented in order to achieve fairness and justice." In re Kaliyah, 455 S.W.3d at 540 (footnote omitted). We exercised this discretion in that case to consider an issue that DCS had not raised in either the trial court or the Court of Appeals. Id. DCS's argument on this point is unpersuasive. Therefore, consistent with our statement in In re Angela E., we hold that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal.[16] 303 S.W.3d at 251 n.14.

In the interest of finally resolving this already protracted appeal as expeditiously as possible, we will review the trial court's findings, rather than remand to the Court of Appeals to do so. Before undertaking that review, however, we next consider Mother's assertion that her statutory right to appointed counsel necessarily includes the right to effective assistance of counsel and the right to a procedure by which she may attack the judgment terminating her parental rights based on ineffective assistance of counsel.

## D. Effective Assistance of Counsel in Parental Termination Proceedings

Our analysis of this issue necessarily begins with Lassiter, in which the United States Supreme Court, in a five-to-four decision, held that the Due Process Clause of the Fourteenth Amendment does not require States to appoint counsel for parents in every parental termination proceeding. 452 U.S. at 24. The Lassiter Court acknowledged that, although "'due process' has never been, and perhaps can never be, precisely defined," it should be understood as expressing "the requirement of 'fundamental fairness,' a requirement whose meaning can be as opaque as its importance is lofty." Id. Discerning

---

[16] To aid in fulfilling this obligation, the Court of Appeals may adopt a rule requiring parents to brief these issues in every appeal.

"what 'fundamental fairness' consists of in a particular situation," the Court explained, is "an uncertain enterprise" that may be accomplished "by first considering any relevant precedents and then by assessing the several interests that are at stake." Id. at 24-25. With respect to the right to appointed counsel, the Court concluded that its prior "relevant precedents" had defined "fundamental fairness" as establishing "the presumption that an indigent litigant has a right to appointed counsel *only when*, if he loses, he may be deprived of his physical liberty." Id. at 26-27 (emphasis added). The Lassiter Court then utilized the three factors enunciated in Mathews v. Eldridge, 424 U.S. 319, 335 (1976), to analyze whether due process requires appointed counsel when there is no potential deprivation of physical liberty but when parental rights are at stake. Lassiter, 452 U.S. at 31.

The Court weighed the three Mathews factors—(1) the private interests at stake; (2) the risk of an erroneous decision; and (3) the government's interest—against the presumption that there is no right to appointed counsel in the absence of a potential loss of physical liberty. Id. The Court reiterated "that a parent's desire for and right to 'the companionship, care, custody and management of his or her children' is an important interest that 'undeniably warrants deference and, absent a powerful countervailing interest, protection.'" Id. at 27 (quoting Stanley, 405 U.S. at 651). The Court pointed out that, where the State prevails in a parental termination proceeding, "it will have worked a unique kind of deprivation," and that "[a] parent's interest in the accuracy and justice of the decision to terminate his or her parental status is, therefore a commanding one." Id. (footnote omitted). The Court emphasized that the State has an "urgent interest in the welfare [of children]" and "in an accurate and just decision." Id. While the State also has a legitimate financial interest in limiting the expenses of termination proceedings, the Court described that interest as minimal. Id. at 28. The State's interests, the Court recognized, "may perhaps best be served by a hearing in which both the parent and the State acting for the child are represented by counsel, without whom the contest of interests may become unwholesomely unequal." Id. As to the final factor, the Court described the procedures in place in North Carolina, where the Lassiter case originated, noted that most parental termination proceedings do not involve "the evidentiary problems peculiar to criminal trials," and observed that "the standards for termination are not complicated." Id. at 29. Nevertheless, the Court recognized that termination proceedings may involve medical and psychiatric evidence and that parents often have little education and are "distress[ed] and disorient[ed]" by the process. Id. at 30. Ultimately, however, the Court concluded that the combined weight of the parent's interests, the government's interests, and the risk of erroneous deprivation was insufficient to "lead to the conclusion that the Due Process Clause requires the appointment of counsel [as a matter of course] when a State seeks to terminate an indigent's parental status." Id. at 31. Rather, the Lassiter Court held that the question of whether Due Process requires the appointment of counsel in parental termination proceedings must be answered on a case-by-case basis. Id. at 32. Appointed counsel is

constitutionally required in parental termination cases only where the trial court's assessment of such factors as the complexity of the proceeding and the capacity of the uncounseled parent indicates an appointment is necessary. Id. at 27-32; see also State ex rel. T.H. by H.H. v. Min, 802 S.W.2d 625, 626 (Tenn. Ct. App. 1990) (explaining that a parent has no absolute constitutional right to appointment of counsel in termination proceedings under the state or federal constitutions and discussing the factors that should be considered to determine if appointment of counsel is warranted in a particular case).

The Lassiter Court recognized that its holding represented a "minimally tolerable" constitutional standard and that "wise public policy" may counsel in favor of a more protective standard. 452 U.S. at 33. The Supreme Court has not revisited the question of appointed counsel in parental termination proceedings in the more than thirty years since Lassiter was decided. This may be because almost all States now provide appointed counsel in every parental termination case, either by statute, constitutional provision, or court rule, and do not condition the appointment of counsel on the outcome of the case-by-case balancing test adopted in Lassiter.[17] See Susan Calkins, Ineffective Assistance of Counsel in Parental-Rights Termination Cases: The Challenge for Appellate Courts, 6 J. App. Prac. & Process 179, 193 (2004).

Tennessee joined this majority in 2009. Rather than incur the time and expense of litigating the right to appointed counsel in each case under the Lassiter balancing test, Tennessee statutorily provides the right to appointed counsel for indigent parents in every parental termination proceeding. Tenn. Code Ann. § 37-1-126(a)(2)(B)(ii) (2014);[18] Tenn. Sup. Ct. R. 13, § 1 (c), (d)(2)(B);[19] Tenn. R. Juv. P. 39(e)(2).[20] Tennessee's

---

[17] Even when Lassiter was decided, thirty-three States and the District of Columbia already provided for the appointment of counsel in parental termination cases. Lassiter, 452 U.S. at 34.

[18] "A parent is entitled to representation by legal counsel at all stages of [a] proceeding . . . involving . . . [t]ermination of parental rights . . . ." Tenn. Code Ann. § 37-1-126(a)(2)(B)(ii).

[19] Tennessee Supreme Court Rule 13, section 1, provides in pertinent part:

(c) All general sessions, juvenile, trial, and appellate courts shall appoint counsel to represent indigent defendants and other parties who have a constitutional or statutory right to representation . . . according to the procedures and standards set forth in this rule.

. . . .

(d) . . . (2) In the following proceedings, and in all other proceedings where required by law, the court or appointing authority shall advise any party without counsel of the right to be represented throughout the case by counsel and that counsel will be appointed if the

(continued…)

statutory right to counsel is not disputed, and it is also undisputed that Mother was represented by appointed counsel in this matter. Instead, Mother asks us to go a step further and hold that the statutory right to appointed counsel includes, in every case, the right to challenge a judgment terminating parental rights based on ineffective assistance of counsel after the appellate court has rendered its decision on a parent's appeal as of right from the judgment terminating parental rights. Mother suggests that the parent should be given a specific period of time, "akin to a time to appeal," to raise the claim of ineffective assistance to the appellate court. Mother asserts that "[t]he appellate court— being the court having most recently reviewed the record and then rendered a decision on that record—would actually be in the most timely position to opine on whether the parent's court-appointed counsel was ineffective or not, based on the face of the record." Mother suggests that "[t]he appellate court could then either decide the claim based on the record or remand the case for an evidentiary hearing (to take place within a time limit) on the issue of whether there was ineffective assistance of counsel, with instructions that if the trial court finds there was ineffective assistance, then the termination of parental rights must be vacated."

DCS responds that the statutory right to counsel does not give rise to a separate right of effective assistance of counsel and a right to mount collateral attacks on judgments terminating parental rights in every case. DCS concedes, however, that if a parent is constitutionally entitled to the appointment of counsel based on the Lassiter balancing test, the parent is also entitled to the effective assistance of counsel. To promote expedited review of termination cases, DCS urges this Court to require parents to raise ineffective assistance of counsel claims by motions filed prior to briefing in

---

(…continued)

party is indigent and, except as provided in (C) and (D) below, requests appointment of counsel.

. . . .

(B) Cases under Titles 36 and 37 of the Tennessee Code Annotated involving allegations against parents that could result in finding a child dependent or neglected or in terminating parental rights;

Tenn. Sup. Ct. R. 13, § 1(c), (d)(2)(B).

[20] "[A]ny party who appears without an attorney shall be informed of the right to an attorney, and in the case of an indigent respondent[,] an attorney shall be appointed pursuant to Tennessee Supreme Court Rule 13[.]" Tenn. R. Juv. P. 39(e)(2).

appeals as of right from orders terminating parental rights. See In re R.E.S., 978 A.2d 182 (D.C. Ct. App. 2009). According to DCS, under this procedure, the Court of Appeals would either rule on the motion in an expedited fashion when the record permits, or if the record is not sufficient, would remand to the trial court for development of a sufficient record while the rest of the appeal proceeds. In light of the importance of providing permanency for children, DCS asserts that remands would occur "only when absolutely necessary to satisfy minimum standards of due process, and under strict instructions and time limits from the Court of Appeals." Finally, to ensure the appellate process is not protracted, DCS suggests that no discretionary appeals should be permitted after the issue of ineffective assistance of counsel is resolved on direct appeal. For purposes of this appeal, DCS presumes that Mother was constitutionally entitled to appointed counsel and therefore was entitled to the effective assistance of counsel. Nevertheless, DCS argues that Mother's appointed counsel provided effective representation and that she is not entitled to relief from the judgment terminating her parental rights.

DCS's argument that the right of effective assistance of counsel arises only if the parent has a constitutional right to counsel under Lassiter is consistent with decisions interpreting the Sixth Amendment[21] right to counsel. The United States Supreme Court has held that, in the absence of a Sixth Amendment right to counsel, there is no constitutional right to effective assistance of counsel, even in proceedings where counsel is appointed by the court. Pennsylvania v. Finley, 481 U.S. 551, 554-55 (1987) (holding that there is no right to counsel or effective assistance of counsel in post-conviction proceedings); Wainwright v. Torna, 455 U.S. 586, 588 (1982) (stating that because there is no constitutional right to counsel for discretionary appeals, there is no right to effective assistance of counsel in such appeals); Ross v. Moffitt, 417 U.S. 600, 610 (1974) (holding that there is no constitutional right to appointed counsel for discretionary appeals). We note as well that, just one year after Lassiter, the United States Supreme Court held that parents cannot use the federal writ of habeas corpus to mount collateral attacks on state judgments terminating their parental rights. Lehman v. Lycoming Cnty. Children's Servs. Agency, 458 U.S. 502, 511 (1982).[22]

---

[21] U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed . . . and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defense.").

[22] Although the jurisdiction of this Court is appellate only, the dissenting justices examine the record and make factual findings to support their assertion that Mother is constitutionally entitled to counsel under Lassiter. The dissenting justices then assert that we have erred by relying on precedent that recognizes the right to effective assistance of counsel arises only if a party has a constitutional right to counsel. It is true that DCS conceded for purposes of this appeal that Mother had a constitutional right to counsel under Lassiter; however, the trial court held no hearing and made no factual findings on this

(continued…)

Likewise, this Court has declined to recognize a right to effective assistance of counsel in the absence of a constitutional right to appointed counsel.[23] See Frazier v. State, 303 S.W.3d 674, 680 (Tenn. 2010) ("[T]here is no constitutional entitlement to the effective assistance of counsel in a post-conviction proceeding. There is a statutory right to counsel. This statutory right does not, however, serve as a basis for relief on a claim of ineffective assistance of counsel in a post-conviction proceeding and does not include the full panoply of procedural protection that the Tennessee Constitution requires be given to defendants who are in a fundamentally different position at trial and on first appeal as of right." (internal quotation marks omitted)); Leslie v. State, 36 S.W.3d 34, 38 (Tenn. 2000) (recognizing that, although post-conviction petitioners have a statutory right to counsel upon filing a petition that states a colorable claim, post-conviction petitioners have neither a constitutional right to counsel nor a constitutional right to effective assistance of counsel).[24]

---

(…continued)

issue. Nevertheless, even assuming Lassiter provides Mother with a constitutional right to counsel, nothing in Lassiter requires state courts to import criminal law concepts of ineffective assistance of counsel or to assess counsel's performance by standards developed in the criminal law context. Instead, Lassiter requires state courts to ensure that parents receive fundamentally fair procedures.

[23] The Tennessee Constitution also provides a right to counsel in criminal cases. Tenn. Const. art. I, § 9 ("That in all criminal prosecutions, the accused hath the right to be heard by himself and his counsel . . . .").

[24] The dissenting justices argue that parental termination proceedings and post-conviction proceedings are factually distinct and should be viewed differently. We disagree. First, factual distinctions, assuming they exist, in no way alter the well-settled legal principle that a litigant has no constitutional right to effective assistance of counsel in the absence of a constitutional right to counsel. Moreover, the assertion that a parental termination proceeding is a parent's "first opportunity to defend herself in court against charges brought by the State, which could forever sever the relationship with her child" is simply incorrect. The facts of this case illustrate the fallacy of this assertion. Mother's parental rights were terminated based upon persistence of conditions, substantial noncompliance with a permanency plan, and mental incompetence. DCS had provided Mother with services aimed at rectifying the issues that ultimately resulted in the termination of her parental rights *for ten years before filing the petition to terminate*. Many court proceedings were held during this time. Indeed, in an order entered after one such proceeding but two years before DCS filed the termination petition, the Juvenile Court found that DCS had made "not only reasonable efforts, but Herculean efforts." In the vast majority of parental termination cases, a parent has multiple opportunities to correct the issues that ultimately result in the termination of parental rights long before the parent is called upon to defend against a termination petition.

As Mother correctly points out, however, most States have held that the right to counsel in parental termination cases, regardless of its basis, includes the right to effective assistance of counsel.[25] Calkins, supra, at 199. Nevertheless, "[m]ost of the [S]tates that have grounded an ineffectiveness claim on a statutory right to counsel have ignored the proposition that there is no right to effective counsel unless it is a constitutional right." Id. at 197. Many of these state courts have opined that the statutory right to counsel is meaningless unless it includes the right to effective assistance of counsel, which these courts have defined as the right to challenge the judgment terminating parental rights based on counsel's ineffectiveness. Id.[26]

---

[25] See, e.g., S.C.D. v. Etowah Cnty. Dep't of Human Res., 841 So. 2d 277, 279 (Ala. Civ. App. 2002) (quoting Crews v. Houston Cnty. Dep't of Pensions & Sec., 358 So.2d 451, 455 (Ala. Civ. App. 1978)); Chloe W. v. Dep't of Health & Soc. Servs., Office of Children's Servs., 336 P.3d 1258, 1265 (Alaska 2014); Jones v. Ark. Dep't of Human Servs., 205 S.W.3d 778, 794 (Ark. 2005); In re Darlice C., 129 Cal. Rptr. 2d 472, 475 (Cal. Ct. App. 2003); People ex rel. C.H., 166 P.3d 288, 290 (Colo. App. 2007); State v. Anonymous, 425 A.2d 939, 943 (Conn. 1979); In re R.E.S., 978 A.2d at 189; J.B. v. Fla. Dep't of Children and Families, 170 So.3d 780, 790 (Fla. 2015); In re A.R.A.S., 629 S.E.2d 822, 825 (Ga. Ct. App. 2006); In re RGB, 229 P.3d 1066, 1090 (Haw. 2010); In re M.F., 762 N.E.2d 701, 709 (Ill. App. Ct. 2002); In re A.R.S., 480 N.W.2d 888, 891 (Iowa 1992) (citing In re D.W., 385 N.W.2d 570, 579 (Iowa 1986)); In re Rushing, 684 P.2d 445, 448-49 (Kan. Ct. App. 1984); In re Adoption/Guardianship of Chaden M., 30 A.3d 935, 942 (Md. 2011); In re Adoption of Azziza, 931 N.E.2d 472, 477 (Mass. App. Ct. 2010) (citing In re Stephen, 514 N.E.2d 1087, 1090-91 (Mass. 1987)); In re Trowbridge, 401 N.W.2d 65, 66 (Mich. Ct. App. 1986); In re J.C., Jr., 781 S.W.2d 226, 228 (Mo. Ct. App. 1989); In re A.S., 87 P.3d 408, 412-13 (Mont. 2004); In re Guardianship of A.W., 929 A.2d 1034, 1037 (N.J. 2007); In re Jessica F., 974 P.2d 158, 162 (N.M. Ct. App. 1998); In re Elijah D., 902 N.Y.S.2d 736, 736 (N.Y. App. Div. 2010); In re S.C.R., 679 S.E.2d 905, 909 (N.C. Ct. App. 2009); In re K.L., 751 N.W.2d 677, 685 (N.D. 2008); In re Wingo, 758 N.E.2d 780, 791 (Ohio Ct. App. 2001); In re D.D.F., 801 P.2d 703, 707 (Okla. 1990); In re Geist, 796 P.2d 1193, 1200 (Or. 1990); In re Adoption of T.M.F., 573 A.2d 1035, 1040 (Pa. Super. Ct. 1990); In re Bryce T., 764 A.2d 718, 722 (R.I. 2001); In re M.S., 115 S.W.3d 534, 544 (Tex. 2003); In re E.H., 880 P.2d 11, 13 (Utah Ct. App. 1994); In re Moseley, 660 P.2d 315, 318 (Wash. Ct. App. 1983); In re M.D.(S)., 485 N.W.2d 52, 55 (Wis. 1992). But see In re Azia B., 626 N.W.2d 602, 612 (Neb. App. 2001) (declining to recognize a claim of ineffective assistance for parental termination cases).

[26] The dissenting justices adopt this approach, stating that, "providing counsel for an indigent parent but not requiring counsel to render effective representation is an empty gesture" and opining that fairness cannot be assured "without requiring the parent's lawyer to be effective[.]" What they apparently fail to recognize is that our refusal to allow parents to repeatedly challenge orders terminating their rights through ineffectiveness claims does not at all negate the ethical obligations all lawyers have to "provide competent representation to a client," which "requires the legal knowledge, skill, thoroughness, and preparation reasonably necessary for the representation" and to "act with reasonable diligence and promptness in representing a client." Tenn. Sup. Ct. R. 8, RPC 1.1, 1.3. These ethical obligations apply in all cases, including civil cases and other quasi-criminal cases, such as post-conviction proceedings, in which litigants have no constitutional right to counsel and therefore cannot assert claims of ineffective assistance of counsel against their lawyers. Lawyers in such cases *daily* provide invaluable services, often on a pro bono basis, to litigants all across this State. We are convinced that lawyers (in general) take their ethical obligations seriously and endeavor to fulfill them, even in cases where litigants have no

(continued…)

Courts that have recognized a parent's right to claim ineffective assistance of counsel are by no means uniform, however, on the procedure by which such claims should be raised. Some courts allow such claims to be raised in post-trial motions,[27] while other courts allow such claims to be raised on direct appeal,[28] and still other courts authorize raising the issue in a petition for habeas corpus.[29]

Courts are also divided on the standard by which such claims should be evaluated. A majority of jurisdictions have adopted an adaptation of the Strickland v. Washington, 466 U.S. 668, 687 (1984) standard.[30] A minority of jurisdictions utilize a fundamental

_____

(…continued)

right to assert ineffective assistance of counsel claims. Thus, we must strenuously disagree with the dissenting justices' assertion that providing counsel in cases where litigants have no right to assert ineffectiveness claims is an "empty gesture." We also very much take issue with the dissenting justices' assertion that fairness cannot be assured in parental termination proceedings unless parents are allowed to bring claims of ineffective assistance of counsel against their attorneys. Were this assertion accurate, fairness could not be assured in any civil or quasi-criminal case which does not include a constitutional right to effective assistance of counsel. Fairness in judicial proceedings does not hinge upon a litigant's right to assert an ineffective assistance claim. Indeed, as detailed hereinafter, in Tennessee numerous procedures are in place to ensure that parents receive the fundamentally fair procedures to which they are constitutionally entitled in parental termination cases.

[27] See, e.g., S.E. v. J.D.G., 869 So.2d 1177, 1179 (Ala. Civ. App. 2003); J.B., 170 So.3d at 794 (adopting an interim procedure whereby "a parent—without assistance of appointed counsel—shall have twenty . . . days after the termination judgment issues within which to file a motion in the trial court alleging claims of ineffective assistance of counsel"); Jones, 205 S.W.3d at 794-95 (declining to consider a claim of ineffective assistance of counsel on appeal because the issue was not first raised in the trial court); In re J.M.S., 43 S.W.3d 60, 64 (Tex. Ct. App. 2001) (allowing ineffectiveness claims to be raised either in a motion for new trial or on direct appeal, but noting the difficulties inherent in not first raising the issue to the trial court and developing the record).

[28] See, e.g., In re Guardianship of A.W., 929 A.2d at 1040; In re Geist, 796 P.2d at 1201; Chloe W., 336 P.3d at 1266; People ex rel. C.H., 166 P.3d at 291; In re R.E.S., 978 A.2d at 193; In re Termination of Parental Rights of James W.H., 849 P.2d at 1079 (N.M. Ct. App. 1993); T.L., 751 N.W.2d at 685; In re Adoption of T.M.F., 573 A.2d at 1043; In re J.M.S., 43 S.W.3d at 64.

[29] See, e.g., In re Darlice C., 129 Cal. Rptr. 2d at 475.

[30] See, e.g., Jones, 205 S.W.3d at 794; In re V.M.R., 768 P.2d 1268, 1270 (Colo. App. 1989); In re A.H.P., 500 S.E.2d 418, 422 (Ga. Ct. App. 1998); In re R.G., 518 N.E.2d 691, 700-01 (Ill. App. Ct. 1988); In re D.W., 385 N.W.2d at 579; In re Guardianship of A.W., 929 A.2d at 1038; In re K.L., 751 N.W.2d at 685; Jones v. Lucas Cnty. Children Servs. Bd., 546 N.E.2d 471, 473 (Ohio Ct. App. 1988); In re N.L., 347 P.3d 301, 304 (Okla. Civ. App. 2014); In re E.H., 880 P.2d at 13; cf. Chloe W., 336 P.3d at 1265; In re Christina P., 220 Cal. Rptr. 525, 129-30 (Cal. Ct. App. 1985); In re Zen T., 88 A.3d 1286, 1288-89 (Conn. App. Ct. 2014); In re Adoption of Azziza, 931 N.E.2d at 477; In re C.R., 646 N.W.2d

(continued…)

fairness test, which inquires whether the alleged deficiencies on the part of a parent's attorney resulted in a fundamentally unfair parental termination proceeding. Calkins, supra, at 216-17. The fundamental fairness standard hues closely to the doctrinal basis from which the right to appointed counsel in parental termination proceedings arises–Due Process. It is also more flexible than the Strickland standard, allowing for such procedural protections as a particular situation demands, and it considers the totality of the circumstances of the proceeding. See In re Geist, 796 P.2d at 1203; In re RGB, 229 P.3d at 1090-91 ("[T]he proper inquiry . . . is whether the proceedings were fundamentally unfair as a result of counsel's incompetence."); In re Adoption of T.M.F., 573 A.2d at 1044 (same); cf. S.C.D., 841 So. 2d at 279-80 ("[T]he test in cases of this type is whether an examination of the entire record demonstrates that the complaining party was afforded a fair trial.").

This Court has not previously decided whether parents have a right to attack a judgment terminating parental rights based on ineffective assistance of counsel. Although the Court of Appeals has not recognized such a right, see In re Grayson H., No. E2013-01881-COA-R3-PT, 2014 WL 1464265, at *13 (Tenn. Ct. App. Apr. 14, 2014) (no perm. app. filed), the intermediate appellate court has addressed claims challenging the effectiveness of appointed counsel's representation by reviewing the appellate record. In the cases reviewed by the Court of Appeals, the record on appeal contained clear proof either that appointed counsel had effectively represented the parent or that appointed counsel had been absent from key portions of the termination proceeding and therefore deprived the parent of the statutory right to appointed counsel. See, e.g., In re Grayson H., 2014 WL 1464265, at *10-11; In re M.H., No. M2005-00117-COA-R3-PT, 2005 WL 3273073, at *7-8 (Tenn. Ct. App. Dec. 2, 2005) (no perm. app. filed); In re S.D., No. M2003-02672-COA-R3-PT, 2005 WL 831595, at *14-15 (Tenn. Ct. App. Apr. 8, 2005) (no perm. app. filed); In re M.E., No. M2003-00859-COA-R3-PT, 2004 WL 1838179, at *15 (Tenn. Ct. App. Aug. 16, 2004), perm. app. denied (Tenn. Nov. 8, 2004).

Furthermore, no Tennessee statute provides a procedure, comparable to post-conviction procedures, by which parents may attack judgments terminating parental rights based on ineffective assistance of counsel. Rather, a Tennessee statute of repose provides that, if an order terminating parental rights is affirmed on appeal, the order is binding and shall not, "for any reason," "be overturned by any court or collaterally attacked by any person after one (1) year from the date of the entry of the final order of

(…continued)

506, 513 (Mich. Ct. App. 2002), overruled on other grounds by In re Sanders, 852 N.W.2d 524 (Mich. 2014); In re Michael C., 920 N.Y.S.2d 502, 503 (N.Y. App. Div. 2011); In re S.C.R., 679 S.E.2d at 909.

termination." Tenn. Code Ann. § 36-1-113(q). After carefully considering this issue, "[w]e conclude that transporting the structure of the criminal law, featuring as it does the opportunity for repeated re-examination of the original court judgment through ineffectiveness claims and post-conviction processes, has the potential for doing serious harm to children whose lives have by definition already been very difficult." Baker v. Marion Cnty. Office of Family & Children, 810 N.E.2d 1035, 1038-39 (Ind. 2004).

Due process unquestionably requires States to provide parents with fundamentally fair procedures, but it does not require States to ignore the other interests at stake in parental termination proceedings. The State has both the right and the responsibility to protect children. "The State's interest in finality is unusually strong in child-custody disputes . . . . It is undisputed that children require secure, stable, long-term, continuous relationships with their parents or foster parents." Lehman, 458 U.S. at 513. In criminal cases, the burdens resulting from extended, collateral attacks on convictions are justified because the complete deprivation of personal liberty "demands a thorough search for the innocent." Baker, 810 N.E.2d at 1040; see also Lehman, 458 U.S. at 515-16 (stating that "[t]he considerations in a child-custody case are quite different" from other cases involving habeas corpus and reserving habeas corpus for "those instances in which the federal interest in individual liberty" is so strong as to outweigh a state's interest in finality). In parental termination proceedings, the burdens of extended litigation fall most heavily upon children—those most vulnerable and most in need of protection, stability, and expeditious finality. Baker, 810 N.E.2d at 1040. "There is little that can be as detrimental to a child's sound development as uncertainty over whether he is to remain in his current 'home,' under the care of his parents or foster parents, especially when such uncertainty is prolonged." Lehman, 458 U.S. at 513–14. "Due to the immeasurable damage a child may suffer amidst the uncertainty that comes with such collateral attacks, it is in the child's best interest and overall well[-]being to limit the potential for years of litigation and instability." Baker, 810 N.E.2d at 1040.

By refusing to import criminal law post-conviction type remedies, we do not at all disregard the well-established constitutional principle precluding the termination of parental rights except upon fundamentally fair procedures. But this constitutional mandate can be achieved without compromising the interests of children in permanency and safety. "By its very nature, 'due process negates any concept of inflexible procedures universally applicable to every imaginable situation.'" Heyne v. Metro. Nashville Bd. of Pub. Educ., 380 S.W.3d 715, 732 (Tenn. 2012) (quoting Cafeteria & Rest. Workers Union, Local 473 AFL-CIO v. McElroy, 367 U.S. 886, 895 (1961)). Tennessee court rules, statutes, and decisional law are already replete with procedures, some previously described herein, designed to ensure that parents receive fundamentally fair parental termination proceedings.

A review of some of the existing procedures illustrates this point. Under Tennessee statutes, parental termination is a last resort, and usually sought only after reasonable efforts have been made to reunify parents with children. See In re Kaliyah, 455 S.W.3d at 553 (citing Tenn. Code Ann. § 36-1-113(h)(2)(C)); Tenn. Code Ann. § 37-1-166 (2014). This case illustrates the point. Here, in an order filed before DCS instituted termination proceedings, the Juvenile Court stated that DCS had made "Herculean" efforts to rectify the problems that led to Carrington's removal. The grounds for termination are statutorily defined and circumscribed, and parents receive notice of the particular grounds on which the State is relying for termination and an opportunity to contest those grounds. Tenn. Code Ann. § 36-1-113(d), (e), (g); Tenn. R. Juv. P. 39(a)-(b); see also Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 546 (1985) (stating that two "essential requirements of due process . . . are notice and an opportunity to respond . . . either in person or in writing, why proposed action should not be taken"); Heyne, 380 S.W.3d at 732 (stating that notice and an opportunity to be heard in a meaningful time and manner are fundamental elements of due process). Indigent parents are provided appointed counsel, and appointed attorneys are ethically obligated to represent parents competently and diligently. Tenn. Sup. Ct. R. 8, RPC 1.1, 1.3. In addition to attorneys appointed for parents, the trial court also appoints an attorney as guardian ad litem for children in parental termination proceedings. See Tenn. R. Juv. P. 39(d) (stating that appointment of a guardian ad litem in a juvenile court parental termination proceeding shall be pursuant to Tenn. Code Ann. § 37-1-149(a) (2014)); Tenn. R. Civ. P. 17.03 (discussing the appointment of guardians ad litem in circuit or chancery courts in all civil actions and in other courts exercising circuit or chancery jurisdiction); In re Adoption of D.P.E., No. E2005-02865-COA-R3-PT, 2006 WL 2417578, at *2 (Tenn. Ct. App. Aug. 22, 2006) (interpreting Tenn. Sup. Ct. R. 13 § 1(d)(2)(D) as requiring the appointment of guardians ad litem in contested parental termination proceedings); In re T.B.L., No. M2005-02413-COA-R3-PT, 2006 WL 1521122, at *2 (Tenn. Ct. App. June 2, 2006) (holding that the chancery court had an obligation to appoint a guardian ad litem, even in the absence of a request, where the petition was contested); see also Newsome v. Porter, No. M2011-02226-COA-R3-PT, 2012 WL 760792, at *2 (Tenn. Ct. App. Mar. 7, 2012) (citing other Court of Appeals' decisions interpreting Rule 13 as requiring appointment of a guardian ad litem in parental termination proceedings). A guardian ad litem is responsible for advocating for the child's best interests and may take a position independent of and opposed to DCS on whether termination is in the child's best interests. In re Adoption of D.P.E., 2006 WL 2417578, at *3. The guardian ad litem must "undertake any and all legally sanctioned actions consistent with [e]nsuring that the child's best interests are protected . . . . [including], among other things, interview[ing] the other parties and witnesses, review[ing] pertinent records, and fil[ing] and respond[ing] to pleadings on the child's behalf." Id.

The accuracy and fairness of parental termination proceedings are enhanced by the elevated standard of proof and by judicial involvement that is more intensive than in other cases. Fair and impartial judges, aware of the interests at stake and knowledgeable of the law, are the fact finders in parental termination proceedings. See Moncier v. Bd. of Prof'l Responsibility, 406 S.W.3d 139, 161 (Tenn. 2013) (recognizing that "[a] basic requirement of due process is a fair trial before a fair tribunal"). While a trial judge must depend on the litigants to present the evidence of grounds and defenses, the judge is not limited to the parties' presentations and may require more evidence, investigation, evaluations, or expert testimony when she determines that more is necessary to resolve the issues at stake. Tenn. R. Juv. P. 39 (e)(3)-(4).

As already noted, before parental rights may be terminated, the State must prove at least one statutory ground for termination by clear and convincing evidence and that terminating parental rights is in the child's best interests. Tenn. Code Ann. § 36-1-113(c). Although some factors relevant to the best interests analysis are statutorily enumerated, the list is illustrative not exclusive. Id. § 36-1-113(i). Parties may introduce proof of any fact relevant to the child's best interests, including proof about DCS's reasonable efforts, or lack thereof, to reunite the child with the parent. Facts relevant to a child's best interests need only be established by a preponderance of the evidence, although DCS must establish that the combined weight of the proven facts amounts to clear and convincing evidence that termination is in the child's best interests. In re Kaliyah, 455 S.W.3d at 555.

As previously discussed, trial courts must make specific written findings on each and every ground alleged for termination and findings on the factors relevant to the child's best interests. Appellate review of parental termination cases is expedited. Tenn. R. App. P. 8A. Indigent parents are entitled to a record at state expense complete enough to allow fair appellate consideration of parents' claims. M.L.B., 519 U.S. at 128; In re Austin C., No. M2013-02147-COA-R3-PT, 2014 WL 4261178, at *6 (Tenn. Ct. App., Aug. 27, 2014). Indigent parents are provided appointed counsel on appeal. Tenn. Code Ann. § 37-1-126(a)(2)(B)(ii) (2014). Finally, our holding in this appeal makes clear that appellate courts must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests. Given these existing procedural safeguards, we decline to hold that securing the constitutional right of parents to fundamentally fair procedures requires adoption of an additional procedure, subsequent to or separate from an appeal as of right, by which parents may attack the judgment terminating parental rights based upon ineffective assistance of appointed counsel.

Moreover, our independent review of the record on appeal refutes Mother's assertion that her counsel's representation denied her a fundamentally fair proceeding. To the contrary, the record illustrates that counsel actively represented Mother at the termination proceeding. As mentioned in the factual summary, appointed counsel was

the only attorney to offer an opening statement. Additionally, appointed counsel cross-examined each witness and pursued the reasonable strategy of showing that Mother had no relationship with Carrington because the trial court had denied her visitation with him and because DCS had failed to make reasonable efforts at reunification. At the time of the 2013 termination proceeding, some appellate decisions had required the State to prove reasonable efforts as a condition precedent to terminating parental rights. In re Kaliyah, 455 S.W.3d at 535 (discussing and overruling those prior decisions). Therefore, appointed counsel's strategy of showing that DCS had failed to make reasonable efforts was designed to defeat DCS's petition to terminate her parental rights.

Appointed counsel also attempted through cross-examination to undermine DCS's proof regarding the grounds for termination. Appointed counsel asked questions on cross-examination designed to show that Mother had substantially complied with the permanency plan, that Mother had corrected at least some of the conditions that led to Carrington's removal, and that Mother had participated in mental health treatment without incident for some period of time.

Although Mother complains of appointed counsel's failure to file an answer to the termination petition, we note that an answer need not be filed. Tenn. R. Juv. P. 39(c) (requiring a respondent to appear personally *or* file a written answer). Additionally, by not filing an answer, appointed counsel avoided admitting or denying each allegation of the petition, which may actually have aided Mother, but which was, in any event, a reasonable choice. Id. Mother also complains of appointed counsel's failure to conduct discovery; however, she fails to explain how this decision denied her a fundamentally fair proceeding. Appointed counsel had represented Mother since 2007 and, therefore, already had access to all the information about the case amassed during those six years. Indeed, the record reflects that appointed counsel participated in formulating the permanency plans. Mother also faults appointed counsel for not filing a witness list in Maury County Juvenile Court, but she fails to identify a court rule requiring the filing of such a list, nor does she explain how appointed counsel's failure to file such a list denied her a fundamentally fair proceeding. Mother also complains that appointed counsel did not call witnesses; however, as already explained, the record reflects that counsel's strategy was to attack DCS's case by cross-examining DCS's witnesses. This strategy led to counsel eliciting testimony from DCS's mental health expert witnesses which was favorable to his argument that DCS had not made reasonable efforts and that the trial court's order denying Mother visitation had prevented her from establishing a relationship with Carrington. In summary, a review of the record on appeal convinces us that appointed counsel's representation did not deprive Mother of a fundamentally fair parental termination proceeding.

We also decline to address Mother's assertion that she is entitled to relief from the judgment terminating her parental rights based on appointed counsel's inadequate representation in the 2008 dependency and neglect proceeding. Dependency and neglect

proceedings are separate and distinct from proceedings to terminate parental rights. See In re M.J.B., 140 S.W.3d 643, 651 (Tenn. Ct. App. 2004), perm. app. denied (Tenn. July 1, 2004) ("A termination of parental rights proceeding is not simply a continuation of a dependent-neglect proceeding. It is a new and separate proceeding involving different goals and remedies, different evidentiary standards, and different avenues for appeal."); In re L.A.J., III, No. W2007-00926-COA-R3-PT, 2007 WL 3379785, at *6 (Tenn. Ct. App. Nov. 15, 2007) (declining to set aside a termination order based on the failure to appoint counsel for Father in a dependency and neglect proceeding). This appeal arises from and involves only the termination proceeding; therefore, any assertion regarding counsel's allegedly deficient representation in the earlier dependency and neglect proceeding is not properly before us in this appeal.

We now turn our attention to reviewing the trial court's findings on the grounds for termination and the child's best interests.

### E. Review of Trial Court's Findings

The trial court found that DCS had offered clear and convincing proof of three grounds supporting termination of Mother's parental rights: (1) substantial noncompliance with the permanency plan; (2) persistence of the conditions that led to the removal of Carrington; and (3) mental incompetence. We review the trial court's findings as to each ground.

### 1. Substantial Noncompliance

A parent's rights may be terminated for her substantial noncompliance with the responsibilities contained in a permanency plan, Tenn. Code Ann. § 36-1-113(g)(2), so long as the plan requirements are "reasonable and related to remedying the conditions which necessitate[d] foster care placement." In re Valentine, 79 S.W.3d 539, 547 (Tenn. 2002). Determining whether a parent has substantially complied with a permanency plan involves more than merely counting up the tasks in the plan to determine whether a certain number have been completed and "going through the motions" does not constitute substantial compliance. Id. The trial court found that Mother "ha[d] failed to comply in a substantial manner with those reasonable responsibilities set out in the foster care plans related to remedying the conditions which necessitate[d] foster care placement." Specifically, the trial court found that Mother had failed to comply substantially with the requirements that she submit to random drug screens, take her medication as prescribed by treating professionals, and continue with mental health services. DCS offered proof to show that Mother had failed to submit to random drug tests, that she had not taken medications as prescribed by treating professionals and had been hospitalized in 2011 and 2012 to receive treatment for opioid abuse, polysubstance dependence, and Xanax abuse, and that her mental health services had been terminated in January 2013 because Mother refused to sign a behavior contract requiring her, among other things, to counsel with a

particular staff member who would prescribe appropriate medications and would not prescribe the medication Mother requested. Although DCS had not asked Mother to submit to random drug testing during the two years prior to the termination hearing, the record contains clear and convincing proof to support the trial court's findings regarding Mother's substantial noncompliance.

## 2. Persistence of Conditions

Parental rights may be terminated for persistence of conditions when:

(g)(3) [t]he child has been removed from the home of the parent . . . by order of a court for a period of six (6) months and:

(A) The conditions that led to the child's removal or other conditions that in all reasonable probability would cause the child to be subjected to further abuse or neglect and that, therefore, prevent the child's safe return to the care of the parent . . . still persist;

(B) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent . . . in the near future; and

(C) The continuation of the parent . . . and child relationship greatly diminishes the child's chances of early integration into a safe, stable and permanent home.

Tenn. Code Ann. § 36-1-113(g)(3). It is undisputed that Carrington had been removed from Mother's custody by court order for more than six months at the time of the termination hearing. In fact, Carrington was removed from Mother's custody in December 2005, and according to the trial court's finding in the order terminating her parental rights, Mother had not been in contact with Carrington since 2012, a year before the termination proceeding. The record reflects that Mother's behavioral problems stemming from her histrionic personality disorder were among the conditions that resulted in Carrington's removal from her custody. Elysse Beasley, senior psychological examiner and licensed professional counselor, testified about Mother's behavioral problems. The trial court found Ms. Beasley to be a credible witness. Ms. Beasley opined that Mother's behavioral problems had not improved and were unlikely to improve sufficiently in the near future to make it safe for Carrington to return to her care. As the trial court also pointed out, another mental health professional, Carrington's counselor, testified that placing Carrington in the care of a person with the same mental health and behavioral disorders as Mother would be "the exact opposite of what the child needs." The trial court noted that Mother had no "relationship of any kind with

Carrington." The record fully supports the trial court's finding that DCS proved the ground of persistence of conditions by clear and convincing evidence.

### 3. Mental Incompetence

The final statutory ground the trial court relied upon to terminate Mother's parental rights is as follows:

> The parent . . . of the child is incompetent to adequately provide for the further care and supervision of the child because the parent's . . . mental condition is presently so impaired and is so likely to remain so that it is unlikely that the parent . . . will be able to assume or resume the care of and responsibility for the child in the near future.

Tenn. Code Ann. § 36-1-113(g)(8)(B)(i). DCS offered proof to show that Mother's mental condition had been impaired for more than six years and was not likely to improve in a short time, even with continued therapy and medication. Mother had been hospitalized on a number of occasions to obtain treatment for mental health issues and substance abuse issues. The mental health experts testified that Mother's impaired mental condition would prevent her from assuming the care and responsibility for Carrington in the near future. In short, the record on appeal fully supports the trial court's finding that DCS proved Mother's mental incompetence by clear and convincing evidence.

### 4. Best Interests Analysis

The proof also supports the trial court's finding that terminating Mother's parental rights is in Carrington's best interests.

> (i) In determining whether termination of parental . . . rights is in the best interest[s] of the child pursuant to this part, the court shall consider, but is not limited to, the following:
>
> > (1) Whether the parent . . . has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest[s] to be in the home of the parent . . .;
> >
> > (2) Whether the parent . . . has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent . . . has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent . . . and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent . . . has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's . . . home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent . . . consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's . . . mental and/or emotional status would be detrimental to the child or prevent the parent . . . from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent . . . has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i). The trial court found: (1) Mother has not made an adjustment of circumstances, conduct, or other conditions so as to make it safe or in the Carrington's best interests to be in her home; (2) Mother has suffered from mental illness and behavioral disorders for many years, and these conditions have not improved, despite treatment, medication, and services provided by DCS, and these conditions are unlikely to improve in the near future; (3) Mother has no meaningful relationship with Carrington and has had no contact with him since 2012; (4) returning Carrington to Mother's care would have a detrimental effect on his emotional, psychological, and medical condition; and (5) Mother's mental and emotional status would be detrimental to Carrington and prevent her from providing him safe and stable care and supervision and from effectively parenting him. We conclude that the evidence in the record does not preponderate against the trial court's factual findings and conclude that the combined weight of these

facts amounts to clear and convincing evidence that termination of Mother's parental rights is in Carrington's best interests.

## III. Conclusion

Given the existing procedural safeguards applicable to parental termination proceedings, we decline to hold that securing the constitutional right of parents to fundamentally fair procedures requires adoption of an additional procedure, subsequent to or separate from an appeal as of right, by which parents may attack the judgment terminating parental rights based upon ineffective assistance of appointed counsel. Having thoroughly reviewed the trial court's findings regarding the grounds for termination and the best interests of Carrington, we affirm the judgment terminating Mother's parental rights. We also conclude that appointed counsel's representation did not deny Mother a fundamentally fair parental termination proceeding. Accordingly, the judgment of the Court of Appeals is affirmed. Costs of this appeal are taxed to the State of Tennessee, for which execution may issue if necessary.

_____
CORNELIA A. CLARK, JUSTICE