FILED
02/26/2025
Clerk of the
Appellate Courts

IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs November 1, 2024

IN RE NATAE'YA M. ET AL.

Appeal from the Juvenile Court for Knox County
No. 207042          Timothy E. Irwin, Judge

_____

No. E2024-00077-COA-R3-PT
_____

The parental rights of Chasity H.[1] ("Mother") were terminated by the Knox County Juvenile Court ("the trial court") on January 22, 2024. Mother appeals, arguing that the trial court erred in finding that termination of her parental rights was in the best interest of the children. Discerning no error, we affirm the trial court's decision.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed;**

KRISTI M. DAVIS, J., delivered the opinion of the Court, in which W. NEAL MCBRAYER and CARMA DENNIS MCGEE, JJ., joined.

Christine L. Dummer, Knoxville, Tennessee, for the appellant, Chasity H.

Jonathan Skrmetti, Attorney General and Reporter, and Katherine P. Adams, Assistant Attorney General, for the appellee, Tennessee Department of Children's Services.

**OPINION**

**BACKGROUND**

This case concerns the termination of Mother's[2] parental rights to her minor children: Natae'ya M.,[3] Geniah M., Brittney H., Baylee H., Chelsey H., Tejan F., Mikael

_____

[1] This Court has a policy of abbreviating the last names of children and other parties in cases involving termination of parental rights to protect their privacy and identities.

[2] Fathers' parental rights are not addressed in this appeal.

[3] Natae'ya aged out of DCS care before this case was tried, and DCS dismissed that portion of its termination petition pertaining to her. However, the case is styled with her name first, and we continue to use the style of the case as it was originally filed.

F., Heavan H., and Zayden F. At the time of termination, the children ranged in age from twenty-one months to fifteen years old.

On August 17, 2021, the trial court entered an emergency order placing all of the children except Zayden, who had not yet been born, into the temporary custody of the Tennessee Department of Children's Services ("DCS") based upon allegations that Heavan was exposed to drugs in utero and that Baylee, who has significant special medical needs, was the victim of severe abuse due to medical neglect. Mother was subsequently found to have committed severe abuse against Heavan and Baylee, and those findings were not appealed. After Mother gave birth to Zayden, he was removed due to allegations of in utero drug exposure, the fact that Mother did not have custody of her other children, and the previous findings of severe abuse.

DCS created three different permanency plans to address Mother's issues. The first plan was developed on September 2, 2021; the second plan was developed on June 1, 2022; and the third plan was developed on January 26, 2023. DCS filed a Petition to Terminate Parental Rights of Mother on March 7, 2023.

At trial, Kendra Shackleford testified that she was the DCS Field Services Worker for Mother. She stated that Mother was taking Subutex for her drug addiction issues. She explained that Mother was supposed to obtain a sponsor and participate in a twelve-step program but that Mother reported only attending meetings once per month, which is not typical for a twelve-step program. Mother was also required to address her mental health issues, as psychological testing was strongly suggestive of anti-social personality traits, a possible dissociative identity disorder, and narcissism. However, Ms. Shackleford testified that Mother only provided a letter from her therapist stating that she was treating Mother. Ms. Shackleford said she did not receive any notes or progress updates from the therapist.

With respect to support for the children, Ms. Shackleford testified that Mother had paid some child support but was over $5,000 in arrears. Mother had not been able to hold a steady job since the children were removed. Ms. Shackleford testified that Mother attended some supervised visits with some of the children. However, she explained that Mother frequently behaved inappropriately during the visits and had to be redirected. For example, Mother would make promises to the children that they would be returning to Mother's care, and Mother would make the children feel guilty when they told Mother about fun activities they were doing with their foster families. With respect to Baylee, Ms. Shackleford explained that Mother was supposed to attend all of Baylee's medical appointments but that Mother attended only half of them. At the appointments she did attend, Ms. Shackleford reported that Mother would engage in behavior that was not appropriate for Baylee's health issues, including insisting on putting Vaseline on Baylee when she was on oxygen, which was dangerous due to the flammability of Vaseline.

With respect to the children, Ms. Shackleford explained that they were all placed with foster families and were doing well. She testified that Geniah and Brittney were in a foster home together and were very comfortable in their environment and participating in sports. She explained that due to Baylee's special medical needs, a change of caretaker would be particularly devastating and potentially life-threatening for her. Chelsey, Tejan, and Heavan were all placed in a foster home together and were doing very well, according to Ms. Shackleford. The children refer to their foster parents as mom and dad. With respect to Chelsey, Ms. Shackleford produced a poem that Chelsey had written to her foster mom, expressing that in "no way" did she want to return to Mother's care. Mikael was doing well in his current foster home, and Ms. Shackleford noted that "it's been amazing the change in him, he's like a different child." Zayden was released from the hospital to his current foster parents at birth, and that is the only home he has ever known.

Ms. Shackleford was asked whether Mother could handle a trial home placement with the children. Ms. Shackleford testified that this was not a good idea because of

> [t]he serious safety concerns likely due to mental health needs, and we have not been able to get records from the person who is supposed to be treating those mental health needs to show what the treatment is, what her progress is. And then in visitation she's demonstrating that there's not been a change; she is continuing to say things that are upsetting to the children and it seems like at times that she is purposely upsetting to the children.

During Ms. Shackleford's testimony, Mother had several verbal outbursts and required multiple admonishments from the trial court. In fact, the proceedings had to be temporarily suspended to allow Mother to take a break to cool off. Ms. Shackleford testified that this type of behavior was consistent with Mother's behavior at Child & Family Team Meetings.

The various foster parents for all the children testified at trial, and all testified that the children were doing well in their placements and had bonded with the foster families. All of the foster families indicated a desire to adopt the children, with the exception of Baylee's foster mother, who was experiencing some health problems of her own. She testified that she was working with DCS on those issues and that she had full-time nursing staff at her home to help care for Baylee.

Mother testified at trial that she had completed parenting classes and submitted to all required drug tests. She explained that she sought treatment for opioid addiction when she lived in St. Louis, Missouri before moving to Knoxville and that she continued to take methadone. She said her plan was to wean herself off the methadone, but by the trial date, she was still taking roughly the same amount of methadone that she had been taking when her children were removed. She testified that she attended counseling twice a week with a therapist and met with a psychologist once per month. In addition to the methadone, she

was currently prescribed escitalopram, buspirone, hydroxyzine, and gabapentin for depression, PTSD, and anxiety. Mother stated that she was not able to work: "I've got a lot going on in my mind, like my kids is gone, like my world has not been the same since my children left me." She tried to take some classes but had to drop out "because I just had too much on my mind." Mother explained that she was prepared to take care of Baylee and her special needs because she was taking good care of her before Baylee was removed. Mother testified that she was not able to visit Geniah and Brittney in the six months prior to trial because their foster placement is in Murfreesboro, and her car was not working. She testified that she had supervised visitation with her other children regularly. Mother testified that she had complied with everything required of her and that her children would be safe in her home. When asked about her psychological issues, Mother stated:

> Narcissist can be true, but the dissociative and anti -- and all of that other stuff, I feel like I function through life very well. I can comprehend and do things myself, like I've never been in no type of special education or -- I have my high school diploma, like I've been in college. I'm just so misunderstood.

At the conclusion of trial, the trial court found grounds for termination based on the two previous findings of severe abuse as to Heavan and Zayden. The trial court performed an analysis of the best interest factors and concluded that it was in the children's best interest that Mother's parental rights be terminated. The trial court specifically noted that

> [t]he thing that keeps going through my mind as I listen to you, and I listened to you, make an excuse for just about everything. I heard about why you got on drugs and how you were going to stop. I heard you're going to do all of these things, but right now it's just you, you don't have any kids that you have to take care of, you're there by yourself. … And in two and a half years, you've made almost no progress, almost none. …There's pages and pages of visitation problems, pages of them of every kind. I mean, I've got to review the progress notes because I was also hearing the permanency plan in this case. And there were problems identified, documented problems, almost every visit.
>
> You haven't worked. I'm not sure who pays your rent. I'm not sure how you could put gas in a car or take care of eight children on no income.

Mother timely filed a notice of appeal.

## ISSUE

Mother raises only one issue on appeal: Whether the trial court erred in finding by clear and convincing evidence that termination of her parental rights was in the best interest

of the children as defined by Tennessee Code Annotated § 36-1-113(i). Although Mother does not challenge the trial court's finding of severe abuse as a ground for termination, we must "review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *In re Carrington*, 483 S.W.3d 507, 525–26 (Tenn. 2016).

## STANDARD OF REVIEW

"A person seeking to terminate parental rights must prove both the existence of one of the statutory grounds for termination and that termination is in the child's best interest." *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (citing Tenn. Code Ann. § 36-1-113(c)). "Because of the profound consequences of a decision to terminate parental rights, a petitioner must prove both elements of termination by clear and convincing evidence." *In re Markus E.*, 671 S.W.3d 437, 456 (Tenn. 2023). This heightened burden "minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights" and "enables the fact-finder to form a firm belief or conviction regarding the truth of the facts[.]" *In re Carrington H.*, 483 S.W.3d at 522 (citing *Santosky v. Kramer*, 455 U.S. 745, 769 (1982); *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010)). "The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not." *Id.* (citing *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005)).

As our Supreme Court recently explained, we employ a two-step process in reviewing termination cases:

> First, appellate courts review each of the trial court's specific factual findings de novo under Rule 13(d), presuming each finding to be correct unless the evidence preponderates against it. *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); *In re Justice A.F.*, [No. W2011-02520-COA-R3-PT,] 2012 WL 4340709, at *7 [(Tenn. Ct. App. Sept. 24, 2012)]. When a trial court's factual finding is based on its assessment of a witness's credibility, appellate courts afford great weight to that determination and will not reverse it absent clear evidence to the contrary. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re Justice A.F.*, 2012 WL 4340709, at *7 (citing *In re M.L.D.*, 182 S.W.3d 890, 894 (Tenn. Ct. App. 2005)).

> Second, appellate courts determine whether the combination of all of the individual underlying facts, in the aggregate, constitutes clear and convincing evidence. *In re Taylor B.W.*, 397 S.W.3d at 112; *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re Justice A.F.*, 2012 WL 4340709, at *7. Whether the aggregate of the individual facts, either as found by the trial court or supported by a preponderance of the evidence, amounts

to clear and convincing evidence is a question of law, subject to de novo review with no presumption of correctness. *See In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *see also In re Samaria S.*, 347 S.W.3d 188, 200 (Tenn. Ct. App. 2011). As usual, the appellate court reviews all other conclusions of law de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d [240,] 246 [(Tenn. 2010)].

*In re Markus E.*, 671 S.W.3d at 457.

## DISCUSSION

### I.    Grounds for termination

*Severe Child Abuse*

Parental rights may be terminated when

[t]he parent or guardian has been found to have committed severe child abuse, as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against any child[.]

Tenn. Code Ann. § 36-1-113(g)(4).[4]  Severe abuse includes "[t]he knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death and the knowing use of force on a child that is likely to cause serious bodily injury or death[,]" and "[t]he commission of an act toward the child prohibited by [the statutes enumerated therein] or the knowing failure to protect the child from the commission of such an act toward the child[.]"  Tenn. Code Ann. § 37-1-102(b)(27)(A), (C).

As we recently explained,

"[i]t is well settled that a trial court may rely on a prior court order finding severe child abuse as a ground for termination and is not required to re-litigate the issue of severe abuse during the termination trial, so long as the prior order is final." *In re Neamiah R.*, No. E2017-02000-COA-R3-PT, 2018 WL 2331868, at *6 (Tenn. Ct. App. May 23, 2018). This Court has consistently applied the doctrine of res judicata to prevent a parent from re-litigating the issue of severe child abuse in a parental termination

---

[4] In termination cases, we apply the version of the statute in effect at the time the petition was filed. *See In re Braxton M.*, 531 S.W.3d 708, 732 (Tenn. Ct. App. 2017).

proceeding when the finding of severe child abuse has become final. *See In re Karisah N.*, No. M2018-00555-COA-R3-PT, 2018 WL 6179470, at \*10 (Tenn. Ct. App. Nov. 27, 2018); *In re I.E.A.*, 511 S.W.3d 507, 517 (Tenn. Ct. App. 2016). "[A] severe abuse finding in a dependency and neglect action becomes final when it was not timely appealed following the dependency and neglect hearing." *In re Caydan T.*, No. W2019-01436-COA-R3-PT, 2020 WL 1692300, at \*5 (Tenn. Ct. App. Apr. 7, 2020) (citing *In re Karisah N.*, 2018 WL 6179470, at \*10; *In re Dakota C.R.*, 404 S.W.3d 484, 497–98 (Tenn. Ct. App. 2012)).

*In re Quentin G.*, No. E2023-01632-COA-R3-PT, 2024 WL 3324105, at \*4 (Tenn. Ct. App. July 8, 2024), *no perm. app. filed*.

In this case, Mother was found to have committed severe abuse against Baylee and Heavan. Mother did not appeal that decision. Consequently, the issue of whether Mother committed severe abuse as to Baylee and Heavan is *res judicata* from the dependency and neglect hearing. Thus, DCS proved this ground for termination by clear and convincing evidence.[5]

## II.     Best Interest

Having determined that statutory grounds for termination exist, we must determine whether terminating Mother's parental rights serves the children's best interest. Following a thorough review of the record, we agree with the trial court that it does.

"Because not all parental conduct is irredeemable, Tennessee's termination of parental rights statutes recognize the possibility that terminating an unfit parent's parental rights is not always in the child's best interest." *In re Jacobe M.J.*, 434 S.W.3d at 573. As such, "[w]hen at least one ground for termination of parental rights has been established, the petitioner must then prove, by clear and convincing evidence, that termination of the parent's rights is in the child's best interest." *Id.* at 572 (citing *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 2004)).

When conducting a best interest analysis, conflicts between the interests of the parent and child are to be resolved "in favor of the rights and best interest of the child." *Id.* at 573 (citing Tenn. Code Ann. § 36-1-101(d)). Importantly, the best interest analysis "must be viewed from the child's, rather than the parent's, perspective." *White*, 171 S.W.3d at 194. Tennessee Code Annotated section 36-1-113(i), which lists factors to be considered as part of the best interest inquiry, states that the trial court "shall consider all relevant and child-centered factors applicable to the particular case before the court."

---

[5] Mother does not dispute the severe abuse finding on appeal.

Tenn. Code Ann. § 36-1-113(i). "Ascertaining a child's best interests does not call for a rote examination" of statutory factors, and "depending upon the circumstances of a particular child and a particular parent, the consideration of one factor may very well dictate the outcome of the analysis." *In re Audrey S.*, 182 S.W.3d at 878 (citing *White*, 171 S.W.3d at 194).

The first factor to consider under section 36-1-113(i)(1) is factor (A), which concerns the effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority. The trial court found as follows:

> [Mother] has not shown she is able to provide stability and continuity for the children. She does not work, it is not clear to the [c]ourt how she is able to pay her rent or put[] gas in her car, much less how she would be able to financially take care of eight children. She is thousands of dollars behind in child support. The [c]ourt also finds [that Mother's] explanation for how she received local housing [is] not credible. Thus, the [c]ourt finds that this factor weighs in favor of terminating [Mother's] parental rights.

The evidence in the record supports this finding.

Factor (B) addresses the effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition. The trial court found that a change in the children's caregivers and physical environment would likely have a negative effect on the children's emotional, psychological, and medical conditions. The trial court referenced the poem written by Chelsey, expressing that she did not want to return to Mother's care. The trial court also found that a change in caregivers for Baylee would be life-threatening. The trial court noted that Zayden's foster family is the only family he has known, and the remaining children were all doing very well in their placements. Thus, the trial court found that factor (B) weighed in favor of termination, and the record supports this finding.

Factor (C) looks at whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs. The trial court found that Mother has safe housing, and, accordingly, he could not find that this factor weighed in favor of termination. We agree with the trial court's determination.

Factor (D) concerns whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment. The trial court found that the children know and love Mother and that an attachment exists between them; thus, the trial court found that factor (D) weighs against termination. We agree with the trial court's analysis with the exception of its application

to Zayden, who has never lived with Mother and has only known his foster family as parental figures.

As to factor (E), whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child, we agree that the record supports the trial court's finding that Mother has not maintained regular visitation and has failed to cultivate a positive relationship with the children. As noted by the trial court, Mother has instead "focused on herself," and there were "documented problems with [her] behavior at almost every visit." This factor weighs in favor of termination.

The trial court determined that factors (F) and (G) were not applicable, and we agree.

Moving to factor (H), whether the child has created a healthy parental attachment with another person or persons in the absence of the parent, the trial court found as follows:

> There is no question the children have created healthy parental attachments in their respective foster homes. The children call their respective foster parents "mom" and "dad." There was testimony from each respective foster home about how the children are thriving in their care. Thus, the [c]ourt finds that [] it is in the children's best interest for termination to be granted as to [Mother], because the children have created a healthy parental attachment with another person or persons in the absence of the parents. The [c]ourt finds that this factor weighs in favor of terminating [Mother's] parental rights.

The record fully supports this finding.

Factor (I) concerns whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage. The trial court found that the children have developed emotionally significant relationships with their siblings in the foster placements and that this factor weighed in favor of termination. We agree.

Factor (J) considers whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner. The trial court determined that Mother had not shown a lasting adjustment of circumstances:

In the approximately two and a half years since the children entered custody, [Mother] has made almost no progress in addressing her circumstances. While she attends a methadone clinic to combat a drug addiction, she has maintained the same dosage for the past two years and has made no progress in recovering from her addiction. It is apparent to the [c]ourt that [Mother] has attended the methadone clinic to maintain her drug habit with a substitute treatment. Moreover, [she] has shown no progress in addressing her mental health needs, as evident in her behavior during visitation. And [Mother] maintains that she was taking great care of Baylee prior to her removal despite the severe child abuse finding.

The evidence in the record supports the trial court's findings, and this factor weighs in favor of termination.

As to factor (K), whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions, the trial court found that Mother attended parenting classes but still struggled during the times she exercised her visitation. The trial court again noted Mother's continued dependence on methadone and concluded that this factor weighs in favor of termination. We agree with the trial court.

Factor (L) addresses whether DCS has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of DCS. The trial court found that it did. Specifically, the trial court noted that DCS provided and paid for an alcohol and drug assessment, mental health assessment, and full psychological assessment. DCS supervised visitation and offered gas cards to Mother, which Mother accepted and then canceled the visitation. The trial court weighed this factor in favor of termination, and we agree with the trial court's analysis.

The trial court found that factor (M) was not applicable, and we agree.

Applying factor (N), whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult, the trial court relied upon the prior findings that Mother had committed severe child abuse against Baylee and Heavan. The record supports application of this factor in favor of termination.

Regarding factor (O), whether the parent has ever provided safe and stable care for the child or any other child, the trial court found that Mother "has provided safe and stable care for the children from time to time" and determined that factor (O) weighed against termination. The evidence supports this finding.

Factor (P) concerns whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive. The trial court determined that Mother cannot meet Baylee's basic needs and that although she may be able to handle some of the children, she cannot handle all of them at once. We agree that this factor weighs in favor of termination.

As to factor (Q), whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive, the trial court found that Mother

> has the physical ability because her home is large enough that it is able to house the children. But [Mother] has not otherwise shown she has the ability or commitment to creating and maintaining a proper home. [She] does not work nor have a functioning vehicle. She is currently only attending approximately half of Baylee's medical appointments and there was testimony that after over two years, [Mother] still does not understand how to care for Baylee's specific needs. And she has not addressed the safety concerns related to her mental health that contributed to the children's removal from her care.

The evidence in the record supports the trial court's findings.

The trial court applied factor (R), whether the physical environment of the parent's home is healthy and safe for the child, in favor of termination. Again, the trial court noted that Mother has not addressed safety concerns regarding her mental health issues, she actively uses methadone and has made no progress in recovering from her addiction, and the home is not safe to care for Baylee's medical needs. We agree with the trial court.

The trial court applied factor (S), whether the parent has consistently provided more than token financial support for the child, in favor of Mother and against termination, noting that Mother has paid child support. Although her consistency might be debated, given that Mother has significant arrears, we do not find that the record preponderates against the trial court's finding.

The final factor, (T), is whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child. For all the reasons previously noted, the trial court found that this factor solidly favors termination, and we agree.

## CONCLUSION

After considering each of the foregoing factors, the trial court ultimately concluded that termination of Mother's parental rights was in the children's best interest. We have conducted our own de novo review of the evidence in the record, and we agree that the combined weight of the factors provides clear and convincing evidence that termination of Mother's parental rights is in the best interest of the children.

The judgment of the trial court is affirmed. Costs on appeal are assessed against the Appellant, Chasity H., for which execution may issue if necessary.

_____
KRISTI M. DAVIS, JUDGE