IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs May 1, 2025

## IN RE WALTER G. ET AL.

**Appeal from the Juvenile Court for Rhea County**
**No. 21-JV-14-PT, 24-JV-14-PT   Jace Cochran, Judge**
_____

**No. E2024-01352-COA-R3-PT**
_____

Mother and Father appeal the trial court's finding that termination is in the best interests of their three younger children. Because we conclude that clear and convincing evidence supports the trial court's findings that Mother and Father committed severe abuse against a child and that the children's best interests are served by termination, we affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed And Remanded**

J. STEVEN STAFFORD, P.J., W.S., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and JOHN W. MCCLARTY, J., joined.

Sarah Hay, Dunlap, Tennessee and Kyle Cokkinias, Dayton, Tennessee for the appellants, Shelby N.A.C. and Dexter L.G.

Jonathan Skrmetti, Attorney General and Reporter; and Allen T. Martin, Assistant Attorney General, for the appellee, State of Tennessee, Department of Children's Services.

**MEMORANDUM OPINION[1]**

---

[1] Rule 10 of the Rules of the Court of Appeals of Tennessee provides:

This Court, with the concurrence of all judges participating in the case, may affirm, reverse or modify the actions of the trial court by memorandum opinion when a formal opinion would have no precedential value. When a case is decided by memorandum opinion it shall be designated "MEMORANDUM OPINION," shall not be published, and shall not be cited or relied on for any reason in any unrelated case.

# I. FACTUAL AND PROCEDURAL HISTORY

This case concerns the termination of the parental rights of Respondents/Appellants Shelby N.A.C. ("Mother") and Dexter L.G. ("Father," and together with Mother, "Parents") to three children, Walter G., born in May 2021, Daxton G., born in June 2022, and Mia G., born in May 2023.[2]

Parents' five older children were removed in the spring of 2021, based on allegations of physical abuse. Eventually, on July 26, 2023, the Rhea County Juvenile Court ("the trial court") found that one of the older children was the victim of severe abuse by Mother and that Father failed to protect the child from the abuse. Specifically, the trial court found that the child suffered from severe malnourishment, a fractured ankle, fractured ribs, and a subdural retinal hemorrhage; that the injuries were the result of non-accidental trauma; and that while Mother may have been the only parent to physically abuse the child, given that the child's physical injuries occurred over time, Father could not have been unaware of the abuse that was occurring. The trial court also found that Parents were both aware of the child's malnourishment but did not take the child for medical treatment despite her bones being visible under her skin. Neither parent appealed from the trial court's finding of severe abuse. At all times relevant to this case, Parents' five older children were not in their custody, but instead were placed with family members.[3]

Each of Parents' following three children were removed months or even days after their birth. First, Walter was removed in August 2021, due to allegations of physical abuse against Mother. Specifically, there were concerns about whether Walter had a bruised or broken femur and had been shaken by Mother. Parents' next two children were removed immediately following their births and have never been in Parents' custody.[4] The three

---

[2] In cases involving termination of parental rights, it is this Court's policy to remove the full names of children and other parties to protect their identities.

[3] According to the July 26, 2023 order, and the later testimony in this case, the five older children were placed in the temporary custody of relatives in three separate homes.

[4] The children were removed based on Eli's law, which provides, in relevant part, as follows:

> (b) Notwithstanding this part to the contrary, there is a presumption that any child that is born to a parent, from whose custody a child has previously been removed for being dependent or neglected and the child who was previously removed is in the custody of the department of children's services, may be dependent or neglected and that it is in the best interest of both children that the child's birth be brought to the court's attention.
> (c) Upon learning of the birth of the subsequent child, the department shall notify the court that adjudicated the first child dependent and neglected and any other party entitled to notice of the subsequent child's birth.
> (d) Upon receiving the notice, the court should immediately schedule a hearing to inquire into the effect of the subsequent child's birth upon the case before the court and to address any further needed steps to protect the safety and well-being of the family.

Tenn. Code Ann. 37-1-188.

younger children were placed in the same foster home, where they remained at the time of trial.

On November 29, 2023, Petitioner/Appellee the Tennessee Department of Children's Services ("DCS") filed a petition to terminate Parents' rights to the three children at issue in this appeal on the sole ground of severe abuse. Trial was held on June 14, 2024. Father, Mother, the children's DCS case worker Jazmyn Partain, and the children's foster mother testified.

Both Parents were charged with felony aggravated child abuse as to the older child and Mother was charged with domestic assault as to Walter. Those charges were still pending at the time of trial. Both Parents testified that these charges were false[5] and prevented them from obtaining stable employment.[6] Still, Parents testified that they held various jobs throughout the pendency of the case, that they attempted to obtain employment though the American Job Center, and that they were currently self-employed doing roofing work. Father and Mother were each ordered to pay $55.00 in child support for the children each month, beginning in August 2022 and August 2023, respectively. An exhibit admitted into the record indicated that Father made twenty-six child support payments in 2023,[7] and no payments either before or thereafter. Although Mother variously testified that she had previously made child support payments or would begin making them soon, DCS presented documentary proof showing that Mother had made no child support payments for the entirety of the custodial period.

Due to the criminal charge against her, Mother was prohibited from having contact with Walter. As a result, Mother and Father were permitted to visit Daxton and Mia every other week, while Father was permitted to visit Walter the alternating week.[8] According to Ms. Partain, Parents ultimately missed approximately one-half to one-third of the scheduled visits over the custodial period, claiming issues with illness or transportation.[9] Mother did not drive and relied on Father or her own father for transportation. Father was asked by DCS to provide proof of transportation and insurance, but declined, explaining that he did not believe that DCS should have access to that information. Ms. Partain

---

[5] In particular, Father testified that he looked through Mother's phone and asked the other children after the incident involving the older child but found no evidence to support the allegations of abuse.

[6] Yet, Parents each testified that they were fired from employment during the custodial period due to allegations of misconduct, with each indicating that the misconduct cited in their termination was not their fault.

[7] Father's payments were generally for around $13.00 per payment, with one payment in August 2023 totaling nearly $1,000.00; it is unclear where this payment originated. The total amount paid was $1,213.45. This amount therefore represented double what Father would have been ordered to pay in a single year.

[8] Father's visitation was suspended for a time when he was ordered to take anger management courses. He completed the course, and visits were reinstated.

[9] While visitation was initially held close to Parents' location, it was eventually moved to be more convenient for the children. Parents testified that the change made it more difficult for them to attend.

testified that she gave Parents information about transportation assistance. Parents testified that they attempted to use this service but that it was unavailable when they needed it. Ms. Partain testified that Parents refused to utilize the service.

According to Ms. Partain and the children's foster mother, visits negatively impacted the children. Prior to visits, Walter, in particular, expressed that he did not wish to attend. As he grew older, Daxton acted similarly. Walter once had a panic attack during a visit, causing him to hyperventilate and cry for twenty minutes. The children would, however, eventually warm up to Parents in the visits, and Father testified that the children loved him and interacted with him normally. Yet, there were behavior issues following the visits, such as tantrums and acting out. Walter and Daxton also had nightmares following visits. It took the children more than a day to return to normal.

Visits were suspended in April 2024, due to drug issues.[10] In particular, Ms. Partain testified that Father smelled of marijuana at a visit in March 2024, prompting Ms. Partain to ask Parents to complete urine drug screens; both parents refused. Parents had previously refused a drug screening in December 2023. As a result, visitation was suspended until Parents completed a hair drug screening. Although Parents made appointments to do so, they had not completed the screening by the time of trial and therefore had no visitation for the preceding two months. Parents claimed that they had attempted to take the tests on three occasions, but were thwarted by sickness, wrong directions, and other issues. Parents had a test scheduled once again for a few days following the termination trial.

Housing was a significant issue for Parents. At the time of Walter's removal, the family resided in hotel. By the time of trial, Parents were living in a "tiny" house that was admittedly not appropriate for the children. During the intervening time, Parents moved in with family or friends but never held a lease in their own names. Father claimed that he was fixing a trailer that could house Parents and the children at issue in the future. Ms. Partain testified that Parents often refused to give her information about their living situation but never asked for assistance to obtain more suitable housing.

Parents completed parenting and anger management classes by the time of trial. They also kept in fairly regular contact with DCS, although they sometimes refused to provide requested information.

The proof showed that the three children at issue were placed in a foster home together, where they flourished. Both the foster mother and Ms. Partain testified that the children are attached to their foster parents, who they view as their parents. They are also close with their foster family's extended family. They never ask about Mother or Father.

---

[10] This was not the first issue concerning drugs. Mia was born with THC in her system, leading to Mother being ordered to complete an alcohol and drug assessment. Mother refused to complete the assessment.

The children have had minimal visits with their older siblings due to logistical issues. By the time of trial, Walter had graduated from Tennessee Early Intervention Services, while Mia was still receiving those services. Walter and Daxton have tongue ties, but Parents have refused to consent to corrective surgery. The foster family is willing to adopt the children.

Following this proof, the trial court entered an order terminating Mother's and Father's parental rights on August 8, 2024, finding that clear and convincing evidence had been presented both of a ground for termination and that termination was in the children's best interests. Mother and Father thereafter appealed to this Court.

## II. ISSUES PRESENTED

Mother and Father appeal only the trial court's best interest determination. We will also briefly address the sole ground for termination found by the trial court. *See In re Carrington H.*, 483 S.W.3d 507, 525–26 (Tenn. 2016).

## III. STANDARD OF REVIEW

Parental rights are "among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions." *Id.* at 521 (collecting cases). Therefore, "parents are constitutionally entitled to fundamentally fair procedures in parental termination proceedings." *Id.* at 511. These procedures include "a heightened standard of proof—clear and convincing evidence." *Id.* at 522 (quotation marks and citations omitted). "Clear and convincing evidence is evidence in which there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence." *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (quotation marks and citation omitted).

In Tennessee, termination of parental rights is governed by statute, which identifies "situations in which [the] state's interest in the welfare of a child justifies interference with a parent's constitutional rights by setting forth grounds on which termination proceedings can be brought." *In re Jacobe M.J.*, 434 S.W.3d 565, 568 (Tenn. Ct. App. 2013) (quoting *In re W.B.*, Nos. M2004-00999-COA-R3-PT, M2004-01572-COA-R3-PT, 2005 WL 1021618, at *7 (Tenn. Ct. App. Apr. 29, 2005) (citing Tenn. Code Ann. § 36-1-113(g))). "Considering the fundamental nature of a parent's rights, and the serious consequences that stem from termination of those rights, a higher standard of proof is required in determining termination cases." *In re Addalyne S.*, 556 S.W.3d 774, 782 (Tenn. Ct. App. 2018). Thus, a party seeking to terminate a parent's rights must prove by clear and convincing evidence (1) the existence of at least one of the statutory grounds in section 36-1-113(g), and (2) that termination is in the child's best interest. *See In re Valentine*, 79 S.W.3d at 546. The clear and convincing evidence standard applicable here is "more exacting than the 'preponderance of the evidence' standard, although it does not demand

the certainty required by the 'beyond a reasonable doubt' standard. To be clear and convincing, the evidence must eliminate any substantial doubt and produce in the fact-finder's mind a firm conviction as to the truth." *In re S.R.C.*, 156 S.W.3d 26, 29 (Tenn. Ct. App. 2004) (internal citation omitted).

Because of the high standard of proof in termination cases, the standard of review is somewhat different than our typical standard under Rule 13 of the Tennessee Rules of Appellate Procedure. As the Tennessee Supreme Court has previously explained:

> To review trial court decisions, appellate courts use a . . . two-step process, to accommodate both Rule 13(d) of the Tennessee Rules of Appellate Procedure and the statutory clear and convincing standard. First, appellate courts review each of the trial court's specific factual findings de novo under Rule 13(d), presuming each finding to be correct unless the evidence preponderates against it. *In re Taylor B.W.*, 397 S.W.3d 105, 112 (Tenn. 2013); *In re Justice A.F.*, [No. W2011-02520-COA-R3-PT,] 2012 WL 4340709, at *7 [(Tenn. Ct. App. Sept. 24, 2012)]. When a trial court's factual finding is based on its assessment of a witness's credibility, appellate courts afford great weight to that determination and will not reverse it absent clear evidence to the contrary. *Jones v. Garrett*, 92 S.W.3d 835, 838 (Tenn. 2002); *In re Justice A.F.*, 2012 WL 4340709, at *7 (citing *In re M.L.D.*, 182 S.W.3d 890, 894 (Tenn. Ct. App. 2005)).
>
> Second, appellate courts determine whether the combination of all of the individual underlying facts, in the aggregate, constitutes clear and convincing evidence. *In re Taylor B.W.*, 397 S.W.3d at 112; *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re Justice A.F.*, 2012 WL 4340709, at *7. Whether the aggregate of the individual facts, either as found by the trial court or supported by a preponderance of the evidence, amounts to clear and convincing evidence is a question of law, subject to de novo review with no presumption of correctness. *See In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *see also In re Samaria S.*, 347 S.W.3d 188, 200 (Tenn. Ct. App. 2011). As usual, the appellate court reviews all other conclusions of law de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d [240,] 246 [Tenn. 2010)].

*In re Markus E.*, 671 S.W.3d 437, 457 (Tenn. 2023).

## IV. ANALYSIS

### A. Ground for Termination

In this case, only a single ground for termination was alleged by DCS and found by the trial court: severe abuse. This ground for termination exists when:

- 6 -

The parent or guardian has been found to have committed severe child abuse, as defined in § 37-1-102, under any prior order of a court or is found by the court hearing the petition to terminate parental rights or the petition for adoption to have committed severe child abuse against any child[.]

Tenn. Code Ann. § 36-1-113(g)(4); *see also* Tenn. Code Ann. § 37-1-102(b)(27) (defining "severe child abuse" as, inter alia, "[t]he knowing exposure of a child to or the knowing failure to protect a child from abuse or neglect that is likely to cause serious bodily injury or death").[11]

Here, Parents were both found to have committed severe abuse against their older child by the trial court in a dependency and neglect proceeding on July 26, 2023. Neither Mother nor Father dispute that this order was not appealed and is final. *See **In re Caydan T.***, No. W2019-01436-COA-R3-PT, 2020 WL 1692300, at *5 (Tenn. Ct. App. Apr. 7, 2020) ("[A] severe abuse finding in a dependency and neglect action becomes final when it was not timely appealed following the dependency and neglect hearing." (citing ***In re Karisah N.***, No. M2018-00555-COA-R3-PT, 2018 WL 6179470, at *10 (Tenn. Ct. App. Nov. 27, 2018))); *see also **State, Dep't of Children's Servs. v. M.S.***, No. M2003-01670-COA-R3-CV, 2005 WL 549141, at *10 (Tenn. Ct. App. Mar. 8, 2005) ("The most serious consequence of a finding that a parent has committed severe child abuse is that such a finding, in and of itself, constitutes a ground for termination of parental rights. The ground itself is proved by a prior court order finding severe child abuse, and the issue of whether abuse occurred is not re-litigated at the termination hearing." (citation omitted)). As such, the finding of severe abuse is res judicata and may not be relitigated in this appeal. *See generally **In re Dakota C.R.***, 404 S.W.3d 484, 497 (Tenn. Ct. App. 2012) (holding that "the doctrine of *res judicata* [ ] prevent[s] a parent from re-litigating whether she committed severe child abuse in a later termination of parental rights proceeding, when such a finding had been made in a previous dependency and neglect action"); *see also **In re Madylynn C.***, No. M2021-00184-COA-R3-PT, 2021 WL 4476810, at *10 (Tenn. Ct. App. Sept. 30, 2021) ("Because neither Appellant challenged the finality or the validity of the adjudicatory dependency and neglect order, the issue of severe child abuse is res judicata."). So the Jul 26, 2023 order "satisfies the 'under any prior order of a court' language in Tennessee Code Annotated § 36-1-113(g)(4)." ***In re Travionna W.***, No. W2021-01349-COA-R3-PT, 2022 WL 8080022, at *4 (Tenn. Ct. App. Oct. 14, 2022). The trial court therefore did not err in finding that Mother and Father had been found to have committed severe abuse against a child such that this ground for termination was proven.

### B. Best Interests

Because we have determined that at least one statutory ground has been proven for

---

[11] Throughout this Opinion, we refer to the version of the relevant statutes in effect at the time that the termination petition was filed.

terminating Father's and Mother's parental rights, we must now decide if DCS has proven, by clear and convincing evidence, that termination of their rights is in the children's best interests. Tenn. Code Ann. § 36-1-113(c)(2); *White v. Moody*, 171 S.W.3d 187, 192 (Tenn. Ct. App. 1994). In determining the best interest of a child, the court "shall consider all relevant and child-centered factors applicable to a particular case before the court." Tenn. Code Ann. § 36-1-113(i)(1). The factors "may include, but are not limited to":

> (A) The effect a termination of parental rights will have on the child's critical need for stability and continuity of placement throughout the child's minority;
> (B) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological, and medical condition;
> (C) Whether the parent has demonstrated continuity and stability in meeting the child's basic material, educational, housing, and safety needs;
> (D) Whether the parent and child have a secure and healthy parental attachment, and if not, whether there is a reasonable expectation that the parent can create such attachment;
> (E) Whether the parent has maintained regular visitation or other contact with the child and used the visitation or other contact to cultivate a positive relationship with the child;
> (F) Whether the child is fearful of living in the parent's home;
> (G) Whether the parent, parent's home, or others in the parent's household trigger or exacerbate the child's experience of trauma or post-traumatic symptoms;
> (H) Whether the child has created a healthy parental attachment with another person or persons in the absence of the parent;
> (I) Whether the child has emotionally significant relationships with persons other than parents and caregivers, including biological or foster siblings, and the likely impact of various available outcomes on these relationships and the child's access to information about the child's heritage;
> (J) Whether the parent has demonstrated such a lasting adjustment of circumstances, conduct, or conditions to make it safe and beneficial for the child to be in the home of the parent, including consideration of whether there is criminal activity in the home or by the parent, or the use of alcohol, controlled substances, or controlled substance analogues which may render the parent unable to consistently care for the child in a safe and stable manner;
> (K) Whether the parent has taken advantage of available programs, services, or community resources to assist in making a lasting adjustment of circumstances, conduct, or conditions;
> (L) Whether the department has made reasonable efforts to assist the parent in making a lasting adjustment in cases where the child is in the custody of the department;

(M) Whether the parent has demonstrated a sense of urgency in establishing paternity of the child, seeking custody of the child, or addressing the circumstance, conduct, or conditions that made an award of custody unsafe and not in the child's best interest;

(N) Whether the parent, or other person residing with or frequenting the home of the parent, has shown brutality or physical, sexual, emotional, or psychological abuse or neglect toward the child or any other child or adult;

(O) Whether the parent has ever provided safe and stable care for the child or any other child;

(P) Whether the parent has demonstrated an understanding of the basic and specific needs required for the child to thrive;

(Q) Whether the parent has demonstrated the ability and commitment to creating and maintaining a home that meets the child's basic and specific needs and in which the child can thrive;

(R) Whether the physical environment of the parent's home is healthy and safe for the child;

(S) Whether the parent has consistently provided more than token financial support for the child; and

(T) Whether the mental or emotional fitness of the parent would be detrimental to the child or prevent the parent from consistently and effectively providing safe and stable care and supervision of the child.

Tenn. Code Ann. § 36-1-113(i)(1). "All factors considered by the court to be applicable to a particular case must be identified and supported by specific findings of fact in the court's written order." Tenn. Code Ann. § 36-1-113(i)(3).

We look first to those factors related to the children's attachments. *See* Tenn. Code Ann. § 36-1-113(i)(A) (involving the effect of termination on the child's need for stability), (B) (involving the effect of a change in caretakers on the child's wellbeing), (D) (involving the security of the parent-child attachment), (E) (involving visitation), (H) (involving the child's attachment to another parent-figure), (I) (involving the child's relationships with others). The trial court generally found that these factors favored termination, citing the strong attachment to the foster family and the lack of strong or stable attachment to Parents. Although Parents take issue with these findings, our review of the record supports the trial court's ruling. Here, the children have spent very little time actually in Parents' care, with the younger two children having been removed immediately following their births. In contrast, the proof shows that the children are strongly attached to their foster parents and their extended family; removal from this home and family would undoubtedly be traumatic for the children. Indeed, while Parents attended the majority of visitations permitted prior to their suspension, the children suffered trauma at simply being required to visit with Parents. As such, these factors strongly favor termination.

We next consider whether Father and Mother can meet the children's needs. *See*

Tenn. Code Ann. § 36-1-113(i)(C) (involving the parent's continuity in meeting the child's needs), (J) (involving the parent's lasting adjustment of circumstances), (K) (involving the parent's use of available resources), (R) (involving the health and safety of the home), (L) (involving whether DCS made reasonable efforts to assist the parent in making lasting adjustments), (O) (involving the parent's prior provision of safe and stable care to any child), (P) (involving the parent's understanding of the child's basic needs), (Q) (involving the parent's commitment to having a home that meets the child's needs), (S) (involving the parent's consistent payment of more than token child support) (T) (involving the effect of the parent's mental and emotional fitness on the child). Again, the trial court generally found those factors concerning Parents' ability to meet the children's needs to favor termination. We agree.

Here, Mother and Father both testified that they have had difficulty obtaining employment due to transportation issues and the pending criminal charges. Even if we were to assume that some of their employment struggles were beyond their control, the simple fact is that, by the time of trial, Mother and Father simply did not have the ability to house or care for their children in a stable manner. Mother and Father admitted that their current home is unsuitable for children. Their lack of housing is not a new issue, as they were living in a hotel when Walter was removed, have lived a generally transient lifestyle since the removal, and have never had lease agreements in their own names for the entirety of this custodial episode. Moreover, Ms. Partain testified that Parents did not seek help to correct this issue from DCS, instead often refusing to provide her with information concerning their housing.

Although Father did pay a significant amount of child support in 2023, Mother and Father have either chosen not to pay support or have not had the resources to do so for the remainder of the time the children have been in DCS custody. Mother and Father also failed to take an ordered hair drug test for two months despite knowing that this failure prevented them from having contact with their children. Due to serious allegations of physical abuse on two separate occasions, none of Parents' eight children are currently in their custody. And these children were removed from their custody within days or months of their births. Parents assertion that the trial court erred in finding that Parents had not shown continuity in providing for the children is, therefore, completely meritless. And while DCS offered to assist Parents in obtaining transportation when it was a barrier to Parents completing their required tasks for reunification, testimony indicated that they declined this assistance. In general, whenever Parents' repeated failure to complete tasks or make progress was pointed out, they failed to take any responsibility for their failure to make progress; instead, that fault always laid with others. Certainly, Parents have made some strides by completing parenting and anger management classes and also attending most of the permitted visitation. But this progress does not make up for the fact that they simply are not in a place where they can provide safe, stable care for a single child, much less three children. These factors therefore weigh in favor of termination.

- 10 -

The trial court also found that those factors that involve abuse to the children or others generally favor termination. *See* Tenn. Code Ann. § 36-1-113(i)(F) (involving the child's fear of the parent's home), (G) (involving whether the child's trauma is triggered by being in the parent's home), (N) (involving any abuse or neglect present in the parent's home). It is true that none of these children would likely have significant memories of Parents' home due to the age at which they were removed. But otherwise, these factors strongly favor termination. Here, both Parents were found to have severely abused an older child, such that she suffered from physical injuries and malnourishment. Walter was removed due to alleged physical injuries, and Mia was also born exposed to THC. Both parents have pending criminal charges related to these allegations. And the proof shows that Walter, at least, sometimes suffers serious trauma when forced to visit with Parents.

Thus, the vast majority, if not all, of the relevant best interest factors favor termination in this case. Here, Mother and Father refuse to accept their culpability in the removal of their children and have made only half-hearted efforts to improve their situation such that the children could be returned to their care. In contrast, the children are placed with a loving family that can provide the safety and stability that Parents lack. "Once a parent has been found to be unfit, the interests of the parent and the child diverge. While the parent's interests do not evaporate upon a finding of unfitness, the focus of the proceedings shifts to the best interests of the child." *White*, 171 S.W.3d at 193. "The child's best interest must be viewed from the child's, rather than the parent's, perspective." *Id.* at 194. In this case, the children's best interests are therefore best served by terminating Parents' parental rights such that the children would be available for adoption in the only safe home that they have ever known. As such, we affirm the trial court's finding that termination of Father's and Mother's parental rights is in the children's best interests.

## V. CONCLUSION

The judgment of the Rhea County Juvenile Court is affirmed, and this cause is remanded to the trial court for further proceedings as may be necessary and consistent with this Opinion. Costs of this appeal are taxed to Appellants Shelby N.A.C. and Dexter L.G., for which execution may issue if necessary.

s/ J. Steven Stafford
J. STEVEN STAFFORD, JUDGE

- 11 -